(No. 51537.–

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. JERRY ARTHUR GLECKLER, Appellant.

*Opinion filed October 17, 1980.*

148

RYAN, J., specially concurring.
UNDERWOOD and WARD, JJ., concurring in part and dissenting in part.

Daniel D. Yuhas, Deputy Defender, of Springfield (Charles M. Schiedel, of Springfield, and Verlin R. F. Meinz, of Ottawa, Assistant Appellate Defenders, of counsel), for appellant.

William J. Scott, Attorney General, of Springfield (Donald B. MacKay, Melbourne A. Noel, Jr., Carolyn B. Notkoff, and Jonathan Strauss, Assistant Attorneys General, of Chicago, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Aaron L. Meyers and John Thomas Moran, Assistant Public Defenders, of counsel), *amicus curiae.*

MR. JUSTICE CLARK delivered the opinion of the court:

A jury in Champaign County found defendant, Jerry Arthur Gleckler, guilty of the shotgun murders of two teenagers, Douglas Scott Simmons and Mark Harris. Two days later, on May 26, 1978, this same jury decided that no mitigating factors existed which were sufficient to preclude a sentence of death. Direct appeal was taken to this court. See 73 Ill. 2d R. 603.

Evidence introduced at trial showed that the bodies of Simmons and Harris were found at 7:30 a.m. on September 26, 1977, in a ditch beside a county road near Mahomet. Both had shotgun wounds in the back and had

been killed by close-range shotgun blasts to the back of the head. Defendant Gleckler was arrested on September 28. Under questioning by police, he agreed to waive his *Miranda* rights and make a recorded statement.

Gleckler was indicted for murder, along with Theodore Parsons and Robert Kirkpatrick, on October 4, 1977. The indictments also charged that Simmons and Harris were killed by defendants during the course of an armed robbery. On December 12, 1977, the State's motion to sever the cases against the three defendants was granted.

The recorded statement and Gleckler's trial testimony formed the bulk of the evidence against him. In his testimony, Gleckler, 35, said he had been a heavy drinker since his teenage years. His background included stints in the National Guard (1964-68) and in the United States Army (1968-74). In 1977, Glecker joined the Harmony House in Danville for help with his drinking problem. There he met and befriended Robert Kirkpatrick. In August, Gleckler met Theodore Parsons, primarily a friend of Kirkpatrick. Gleckler and Kirkpatrick got drunk on August 30, and Gleckler did not again return to Harmony House. He moved into a trailer of a friend of Kirkpatrick.

On September 23, 1977, Gleckler, Kirkpatrick and Parsons, during a drive back from the home of Kirkpatrick's parents, discussed farmers in the area who owned guns. Gleckler mentioned a residence containing several guns. On September 24, Parsons visited Gleckler and persuaded him to burglarize that residence. They stole two shotguns (one 12-gauge and one 20-gauge), ammunition, and several other guns thought by Gleckler to be worth $3,000. Gleckler testified that he wanted to sell these guns. (Apparently one of the guns was eventually sold after the crime at issue here took place.)

Gleckler and Parsons went back to the trailer. Parsons left and then returned with Kirkpatrick. Gleckler briefly assisted Parsons in sawing off the barrel of a shotgun and

then went to sleep. Parsons and Kirkpatrick left the trailer at 6 or 7 p.m.

Other testimony showed that Kirkpatrick and Parsons that evening robbed and shot a gas station attendant, who was able to describe his assailant (Parsons) and his accomplice (Kirkpatrick) and their vehicle (Parsons' car). The next day Gleckler was persuaded by Kirkpatrick and Parsons to take a ride with them, supposedly in order to sell the 12-gauge shotgun. Instead they drove around. Gleckler, having consumed 8 to 10 beers, slept in the car for most of the time. That evening they ate dinner in a Mahomet restaurant. Another patron overheard a portion of their conversation in which one of the three cautioned the group to avoid doing anything by which someone could recognize them.

After eating they drove to a liquor store. Glecker went inside and bought beer and whiskey. When Gleckler returned to the car, Parsons asked several questions about the store and revealed an intention to rob it. When Gleckler demurred, Parsons said he was "chicken s---" like Kirkpatrick and then disclosed the robbery and shooting of the prior evening.

It is obvious that some sort of criminal enterprise was agreed upon and that obtaining another car, to avoid identification of Parsons', was a crucial element of their plan.

To that end they cruised an apartment complex but, upon seeing a police car, they returned to the liquor store parking lot. Parsons' stated intention was to follow an exiting store patron and take his or her car. Gleckler, in his testimony and in his arrest statement, said generally that he argued against robbing the liquor store and against following a store patron. At this time he went into the tavern to use the bathroom and have a drink. He told Kirkpatrick to "talk" to Parsons. After Gleckler returned to the car, another car, a green Plymouth with a white top,

later identified as the victims' car, pulled into the lot and one occupant got out and went into the store. This person came out and reentered the Plymouth. When it left, Parsons, with Kirkpatrick in the front seat and Gleckler in the back seat, drove after it. Parsons followed the car and twice flashed his lights at it to get it to stop.

In his arrest statement, Gleckler was asked specifically if Parsons said anything other than that he was going to stop and take their car. Gleckler answered, "No, he didn't." The Plymouth ultimately pulled over or was forced off the road. Parsons pulled over and parked in front of them, got out of the car, and told the occupants of the Plymouth to get out of their car without looking. No further words were spoken between the victims and Parsons.

Gleckler began to get out of the car. He heard two shotgun blasts. At this point, however, Gleckler's arrest interview and trial testimony diverge. In the arrest interview Gleckler said that when he saw how badly the boys were shot, he went back to the car, loaded his gun, returned to the ditch where the boys lay bleeding, sounding as if they were choking, and shot each of them twice in the back of the head. Either Kirkpatrick or Parsons brought him shells to reload after his first shot.

Gleckler was asked when he decided to "finish" the boys off.

> "A. After I had already looked down and they had so much blood running out of them, I knew there wasn't no way they could be saved.
>
> Q. So you knew, in your own mind, you had to do that when you left and went back to the car—car for shells?
>
> A. They was just—they were just laying there and dying. There wasn't no—couldn't even have a doctor come in time."

The questioner continued:

> "Q. Did either one of these young men put up any kind of a struggle—struggle before being shot?

A. No sir. I didn't hear them say nothing.

Q. Did they have any chance for a defense to defend themselves?

A. Not that I know of. There—there was no reason for it. I thought he [Parsons] was going to take them in the cornfield and tie them up, and that was—

Q. Had you discussed, the three of you, that that would be the thing to do, to tie them up, or you just—

A No, I told them to take them and just tie them up, and I think that's good enough. I didn't have the slightest idea that was going to go on a ride with it.

Q. But at this point, your basic thing was your wanting the car?

A. That's all. Transportation.

Q. And then you were going to use that car of theirs to go back and pull the armed robbery of the liquor store? Is that correct?

A. Uh—yes."

After the shootings, Gleckler said that he got into the Plymouth, whereas Parsons and Kirkpatrick rode in Parsons' car. Both cars drove by the liquor store, Gleckler stopping for gas along the way, but any plans to rob it were abandoned when it was determined that it was closed. When Parsons revealed a desire to rob a gas station, Gleckler at that point spoke to the effect that he explicitly withdrew from the criminal enterprise.

In response to leading questions about the appearance of the victims, Gleckler said he could not describe them, although he knew they were young, and that he knew nothing until reading press reports the next day of money that was missing from the victims' wallets. He also said that he brought the 12-gauge shotgun back to the trailer where he was staying, that he disposed of the Plymouth on the day after the murders by running it down a deep ravine in Indiana, and that he disposed of the clothes and gloves he was wearing that night by weighting them with a rock and throwing them in a creek. At the end of the questioning, Gleckler agreed that his answers had not been in-

fluenced in any way by law-enforcement officials and that they had discussed all significant aspects of the incident.

At the trial, however, Gleckler said that, after he heard the two shotgun blasts and got out of the car, Parsons ordered him to get a shotgun and shells and load it. Parsons then ordered him to shoot the victims. When Gleckler at first refused, Parsons said to shoot or he would blow his "f---ing head off." Gleckler turned his head away and shot each victim. Gleckler testified at trial that Kirkpatrick did ride with him in the Plymouth after the shootings but that they did not stop for gas. Parsons allegedly came over to the Plymouth before driving away and told Gleckler that he would not be able to "tell" on him now because "you shot them too."

On cross-examination, Gleckler conceded that when he was arrested he had not told police of Parsons' threat. Nor had he so informed police after the initial arrest interview despite at least one such opportunity.

In a contradiction of his arrest statement, Gleckler testified that he had not weighted his clothes with a stone and disposed of them in water someplace. They were in fact found in the trailer where he lived. The only explanation attributable to Gleckler for the differences between his arrest interview and his trial testimony was that, upon his arrest, he was "mixed up," his hands were "shaking," and he was "just trying to remember" what happened. The interviewing officers denied that Gleckler's hands were shaking or that his speech was slurred or otherwise indicative of a mental disturbance or condition which would have prevented him from truthfully answering questions.

The State introduced other evidence at the trial, including exhibits, like shotgun shells, found at the scene of the crime, photographs of the crime scene, and Gleckler's bloodstained clothing. The pathologist testified that single shotgun shots were inflicted to the heads of the victims, causing instantaneous death. Other evidence not

relevant here was also introduced. It is sufficient to say that there was more than enough evidence of defendant's guilt.

In a lengthy brief, defendant challenges several rulings of the trial court during the guilt and sentencing stages of the trial and the propriety and constitutionality of sentencing him to death.

Defendant first argues that the trial court erred in refusing a tendered jury instruction on the statutory defense of compulsion and in refusing to instruct the jury on voluntary manslaughter because of the evidence of compulsion. He argues alternatively that the death penalty cannot be imposed for murder where there is evidence of compulsion because our criminal statutes inadequately provided notice that his conduct was punishable with death. The initial inquiry involves a determination of legislative intent. Because we find that the legislature intended to preclude the defense of compulsion for the crime of murder and prevent the crime of murder from being reduced to one of voluntary manslaughter based on evidence of compulsion, we must also decide whether Gleckler had fair notice that he could receive a sentence of death for killing, allegedly under Parsons' orders, the two victims.

Criminal statutes are to be construed with reference to the general purposes of the Criminal Code of 1961. As set forth in section 1—2, these purposes are to:

"(a) Forbid and prevent the commission of offenses;

(b) Define adequately the act and mental state which constitute each offense, and limit the condemnation of conduct as criminal when it is without fault;

(c) Prescribe penalties which are proportionate to the seriousness of offenses and which permit recognition of differences in rehabilitation possibilities among individual offenders;

(d) Prevent arbitrary or oppressive treatment of persons accused or convicted of offenses." (Ill. Rev. Stat. 1977, ch. 38, par. 1—2.)

To be avoided are constructions of criminal statutes contrary to legislative intendment (*People v. Beam* (1979), 74 Ill. 2d 240, 242-43; *People v. Hudson* (1970), 46 Ill. 2d 177, 181) or which bring the criminal law into disrepute. See generally Hall, *Strict or Liberal Construction of Penal Statutes,* 48 Harv. L. Rev. 748 (1935).

Section 7—11(a) of the Criminal Code of 1961 states that "[a] person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." (Ill. Rev. Stat. 1977, ch. 38, par. 7—11(a); see generally Ill. Ann. Stat., ch. 38, par. 7—11(a), Committee Comments, at 432-33 (Smith-Hurd 1972).) A defendant's claim of compulsion is an affirmative defense (Ill. Rev. Stat. 1977, ch. 38, par. 7—14) which, if he produces "some evidence thereon," requires the State to disprove his claim beyond a reasonable doubt (Ill. Rev. Stat. 1977, ch. 38, par. 3—2).

The trial judge was undoubtedly correct in ascertaining legislative intent with respect to this defense. Defendant correctly points out that in 1827, when the defense of compulsion was first codified and made applicable only to offenses "not punishable with death," the crime of murder was automatically punishable with death. (Criminal Code of 1827, secs. 11, 24, Ill. Rev. Code of Laws, 1827, at 125, 128.) Defendant does not argue, however, that because the death penalty for all murders became discretionary in 1867 (1867 Ill. Laws 90), the limitation of the compulsion defense to offenses "not punishable with death" became nugatory at that time.

Nor could we say that the phrase "other than an offense punishable with death," which linguistically had the same effect as the phraseology used in 1827, of excluding the compulsion defense for all murders, when it was en-

acted in 1961 (Ill. Rev. Stat. 1961, ch. 38, par. 7—11(a)), was rendered meaningless by the fact that the death sentence was a discretionary punishment for all murders at the time. (See Ill. Rev. Stat. 1961, ch. 38, pars. 1—7, 9—1.) As evidenced by the committee comments (Ill. Ann. Stat., ch. 38, par. 7—11 (Smith-Hurd 1972)), this State, in enacting this provision, intended to apply the common law rule that one ought himself to die rather than escape through the murder of an innocent. (The compulsion defense was also rendered unavailable to crimes other than murder because death was an authorized penalty. (See, *e.g.*, Ill. Rev. Stat. 1977, ch. 38, par. 30—1 (treason), par. 10—2 (aggravated kidnapping for ransom).) Use of the phrase "offense punishable with death" can only be explained with reference to this purpose.)

The death penalty, as enacted in 1961 and recodified by Public Act 77—2097 (approved July 26, 1972), was ruled unconstitutional by the United States Supreme Court in *Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562, with reference to *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726. Public Act 78—921 (certified Nov. 8, 1973) reenacted the death penalty in attempted compliance with *Moore* and *Furman.*

In *People ex rel. Rice v. Cunningham* (1975), 61 Ill. 2d 353, this court ruled that act unconstitutional. The legislature, in response, passed Public Act 80—26 (approved June 21, 1977), upheld by this court in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, and *People v. Brownell* (1980), 79 Ill. 2d 508, which is the current death penalty provision.

The legislative desire to permit the discretionary imposition of the death penalty in 1867 cannot be transformed into an intent to allow the defense of compulsion in any murder case, especially in view of the reaffirmation of the exclusion of the compulsion defense from such

cases in 1961. Nor can we say that the revisions of the death penalty compelled by *Moore* and *Cunningham* were intended to disturb the meaning of section 7—11(a), which had been settled since 1827. Moreover, compulsion was mentioned specifically in Public Act 80—26 as a mitigating factor which might be "sufficient to preclude the imposition of the death sentence ***." (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(c)(4), 9—1(g).) We already have held that the sentencing procedure of our death penalty statute contemplates "a weighing process" involving aggravating and mitigating factors. (*People v. Brownell* (1980), 79 Ill. 2d 508, 537-38.) It would be impossible to respect the legislature's command that compulsion constitute one factor to be weighed were we to hold that it instead exonerated a defendant from a murder charge. The defense of compulsion, therefore, as a matter of legislative intent, is unavailable to one charged with murder.

For similar reasons, evidence of compulsion, as a matter of legislative intent, does not entitle a defendant to a voluntary manslaughter instruction. Although defendant did not formally tender such an instruction, we do not view this argument as waived. Defendant objected to People's Instruction No. 4 (Illinois Pattern Jury Instructions, Criminal, No. 2.01 (1968)) on the grounds that a voluntary manslaughter instruction should be given. This objection was overruled. It would have been futile for defendant to tender such an instruction after this ruling. Defendant renewed the objection in his post-trial motion and was overruled again. In addition, the interface of section 7—11(a) with section 9—2(b) (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b)), a case of first impression in this court, is a significant issue which this court should settle (see *People v. Jones* (1979), 81 Ill. 2d 1, 7) and has been fully briefed by both parties.

The portion of the voluntary manslaughter statute pertinent to this appeal provides that "[a] person who

intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.'' (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b).) Voluntary manslaughter is therefore not established where the defenses of article 7, by their own terms, history and purpose, are inapplicable. Our legislature long ago decided, contrary to the present status of a majority of jurisdictions, as the State conceded, that one threatened with the imminent infliction of death or great bodily harm cannot take another's life and escape a murder conviction.

Defendant argues that even if the compulsion defense is unavailable as a matter of legislative intent, the statute as presently written provides inadequate notice to those who murder, under threat of death or great bodily harm, that their acts are punishable with death. Under the due process clause of the fifth amendment, applicable to the States by the fourteenth amendment, one's act must be determinable as a crime attendant with specified sanction possibilities before it is committed. *United States v. Batchelder* (1979), 442 U.S. 114, 123, 60 L. Ed. 2d 755, 764, 99 S. Ct. 2198, 2203-04; *Colautti v. Franklin* (1979), 439 U.S. 379, 390-91, 58 L. Ed. 2d 596, 606, 99 S. Ct. 675, 683.

Insofar as defendant's vagueness challenge is based upon the weighing of aggravating and mitigating factors contemplated by the statute, it is unpersuasive for the reasons stated in *People v. Brownell* (1980), 79 Ill. 2d 508, 527-34. And insofar as it is based upon the prosecutor's discretion, it is foreclosed by our decision in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531.

Apart from these challenges, this defendant had adequate notice before the incident, had he cared to consult the statute, that he risked the death penalty for

submitting to Parsons' threats by killing Simmons and Harris. Capital punishment is authorized whenever one murders another under the conditions specified in section 9—1(b) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)), although mitigating factors may be sufficient to preclude this punishment (Ill. Rev. Stat. 1977, ch. 38, pars. 9—1(c), (g), (h)).

"Punishable," as in "an offense punishable with death" under section 7—11(a) (see Webster's Third New International Dictionary 1843 (1971)), sends a clear warning to prospective murderers that compulsion is an unavailable defense when the crime is committed under the conditions of section 9—1(b), because that crime may be deemed deserving of death, *i.e.*, death is a sanction which is capable of being imposed.

Defendant, moreover, was warned that evidence of compulsion could not reduce a charge of murder to manslaughter. A voluntary manslaughter jury instruction is required when there is evidence which would exonerate a defendant "under the principles stated in Article 7." (Ill. Rev. Stat. 1977, ch. 38, par. 9—2(b).) Because these principles do not come into play, defendant could not have been misled before either the crime or the trial. No voluntary manslaughter instruction, therefore, was required here under principles of due process.

Defendant, however, points toward an alleged contrary interpretation by the writers of a well-respected criminal law textbook (W. LaFave & A. Scott, Criminal Law sec. 77, at 585 & n.14 (1972)) as evidence that the statute is vague. On the cited page, the authors say that it is "arguable" to find one who kills under compulsion guilty of manslaughter rather than murder. In support of that argument, the authors cite two of "the latest state criminal codes ***." (LaFave & Scott sec. 77, at 585.) The two criminal codes cited in the footnote are those of Minnesota and Wisconsin. The Illinois voluntary man-

slaughter statute is then compared with them and with the provisions of the model penal code. The authors, citing only section 9–2, state: "The crime is voluntary manslaughter and not murder only if the defendant believed, unreasonably, in the existence of circumstances which, if true, would have justified the taking of human life under the statutory defenses of compulsion or necessity." (LaFave & Scott sec. 77, at 585.) If compulsion is a defense unavailable to one charged with murder, both our interpretation of the statute and the statement of LaFave and Scott are accurate, since the taking of a human life would not be justified "under" the defense of compulsion. Earlier in their work, these authors carefully explained that a compulsion defense was unavailable in a murder prosecution in Illinois. (LaFave & Scott sec. 49, at 375-76 & n.11.) Defendant's argument, even on its own terms, is unpersuasive.

A distinguishable situation would be presented here on due process grounds if no aggravating factor under section 9–1(b) were alleged. But in view of our interpretation of the legislative intent, we hold that henceforth the defense of compulsion is unavailable in any murder prosecution either as a defense or to entitle a defendant to a voluntary manslaughter instruction. We cannot implement this decision retroactively (see *Bouie v. Columbia* (1964), 378 U.S. 347, 12 L. Ed. 2d 894, 84 S. Ct. 1697), but as a State court of last resort, we have a duty to remain faithful to the intent of the legislature regardless of the literal meaning of the statute (*People v. Hudson* (1970), 46 Ill. 2d 177, 181). And we have a duty to clarify ambiguities created in the first place by court decisions striking down prior State death penalty statutes. (*Cf. Williams v. Crickman* (1980), 81 Ill. 2d 105, 111-12 (judicial duty to resolve conflicting decisions regardless of legislative reenactment of statutory provision subsequent to a particular court decision); *cf. Rylander v.*

*Chicago Short Line Ry. Co.* (1959), 17 Ill. 2d 618, 624-26 (legislative change pursuant to court ruling held not to disturb settled meaning of another statutory provision regardless of its new literal meaning).) The enlargement of the literal meaning of a criminal statute by a State court of last resort is permissible, at least where such an enlargement conforms with legislative intent (see also Ill. Rev. Stat. 1977, ch. 38, par. 1—2(a)), the common law, and all prior legislative provisions (*Rose v. Locke* (1975), 423 U.S. 48, 46 L. Ed. 2d 185, 96 S. Ct. 243 (*per curiam*); *Wainwright v. Stone* (1973), 414 U.S. 21, 38 L. Ed. 2d 179, 94 S. Ct. 190 (*per curiam*)), and has the advantage of providing fair warning for potential transgressors.

For the foregoing reasons, defendant's murder convictions stand. Defendant makes numerous other arguments, among them: that the death penalty statute is unconstitutional, that the indictment gave inadequate notice that the death penalty was authorized, that the trial judge made erroneous rulings during *voir dire,* during the trial, and during the sentencing proceeding, that the prosecutor made improper arguments to the jury during sentencing, and that recent studies have demonstrated that the exclusion of potential jurors because of their inability to impose the sanction of death results in a conviction-prone jury. The latter argument and the alleged trial error are more appropriately considered in a case where there is some question about defendant's guilt. The former issues will not be addressed here because the defendant cannot be executed under principles of the eighth amendment or Illinois case law.

There is a qualitative difference between death and imprisonment as penalties. (*Furman v. Georgia* (1972), 408 U.S. 238, 286-91, 33 L. Ed. 2d 346, 376-79, 92 S. Ct. 2726, 2750-53 (Brennan, J., concurring); 408 U.S. 238, 306, 33 L. Ed. 2d 346, 388, 92 S. Ct. 2726, 2760 (Stewart, J., concurring).) The State must avoid arbitrary

executions by adequately defining capital offenses, by suitably directing sentencing discretion, and by ensuring adequate judicial review of cases in which the death sentence is imposed. (See *Godfrey v. Georgia* (1980), 446 U.S. 420, 428, 64 L. Ed. 2d 398, 406, 100 S. Ct. 1759, 1764; *Gardner v. Florida* (1977), 430 U.S. 349, 361-62, 51 L. Ed. 2d 393, 404, 97 S. Ct. 1197, 1206-07; *Gregg v. Georgia* (1976), 428 U.S. 153, 186-208, 49 L. Ed. 2d 859, 881-95, 96 S. Ct. 2909, 2931-41; *Proffitt v. Florida* (1976), 428 U.S. 242, 258-60, 49 L. Ed. 2d 913, 926-27, 96 S. Ct. 2960, 2969-70.) The decision to execute a defendant must be, and appear to be, based upon reason rather than caprice or emotion. (*Gardner v. Florida* (1977), 430 U.S. 349, 358-59, 51 L. Ed. 2d 393, 402, 97 S. Ct. 1197, 1204.) The key elements of the decision are the nature of the offense and the character of the defendant. *Roberts v. Louisiana* (1976), 428 U.S. 325, 334, 49 L. Ed. 2d 974, 982, 96 S. Ct. 3001, 3006.

Our appellate-review procedure was designed with these principles in mind. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(i); 73 Ill. 2d Rules 603, 606(a), 607(a), 609(a), 611(a), 613(a), 615; see generally *People v. Brownell* (1980), 79 Ill. 2d 508, 541-42.) This court historically has exercised its power to reduce criminal sentences, in both capital and noncapital cases, where it deemed them unduly severe. (See, *e.g., People v. Viser* (1975), 62 Ill. 2d 568, 586-87; *People v. Cannon* (1971), 49 Ill. 2d 162, 167-68; *People v. Crews* (1969), 42 Ill. 2d 60, 66; *People v. Walcher* (1969), 42 Ill. 2d 159, 165-67; *People v. Carlson* (1980), 79 Ill. 2d 564, 587-91.) And we are constitutionally required to consider both the circumstances of the offense and the character of a defendant. Ill. Const. 1970, art. I, sec. 11.

The State produced no additional evidence at Gleckler's sentencing hearing. After argument from both sides, the jury found, in aggravation, that the defendant

was over 18 years of age and intentionally had killed two individuals while in the course of an armed robbery. Therefore, two aggravating factors were proved. (See Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(b)(3), 9—1(b)(6).) No other written findings were made.

Officials at the Harmony House testified in mitigation about Gleckler's alcoholism. The substance of their testimony was that the defendant was hard to motivate, was more of a follower than a leader, that although at a time he made some progress and undertook some responsibility under their supervision, he ultimately never conquered his problem and in fact denied that he had one or blamed it on the influence of friends. Gleckler's rationalization of his problem was deemed normal for one in his circumstance.

Defendant's mother testified about the defendant's generally normal childhood. She stated, however, that he was always very timid. And she recounted that his "habit" of going through her dresser drawers and "bothering" her underwear had led her and her husband to take him to a psychiatrist at some undisclosed point while he was growing up. Her testimony regarding defendant's alcoholism generally paralleled and supplemented that of the Harmony House officials. He lost rank in the army and several civilian jobs as a result of his alcoholism.

The defendant testified again at the sentencing hearing, reiterating the substance of his trial testimony, admitting that he failed to tell the police that Parsons had threatened him and that such a fact was a "significant thing to tell somebody ***." He also said he was "truly sorry those young gentlemen are dead."

A psychologist from the Institute for Personality Testing discussed Gleckler's personality. Relying on a "widely accepted" test, "between .75 and .85 reliable," he said that the defendant was not below average as to intelligence, scored high as to stability, was "more sober or

serious or depressed than about 89 out of 100 people," was "more conscientious and more rigid than 89 out of 100 people," was "as tough-minded or realistic as about 60 out of 100 people," was slightly above average as to his imagination, and was "more polished, more astute, more sophisticated than about 89 out of 100 people," and "not particularly apprehensive." The psychologist's conclusion, however, based on these and additional questions, was that the term "doormat" best described defendant's personality: "He had the unusual profile of the type of person who gets walked on by almost anybody. His profile showed very few strengths."

For this conclusion, the psychologist relied upon factor H, which showed defendant to be "more shy, more timid and more sensitive to threats than some 99 out of 100 people, factor E, which showed defendant to be "more docile, more accommodating and more easily led than some 99 out of 100 people," factor A, which indicated defendant to be "more cool, aloof and detached than some 96 out of 100 people," factor L, which showed defendant to be "more trusting and accepting than about 90 out of 100 people," and the "Q-2" scale, which showed defendant to be "more of a loner and self-sufficient than about 96 out of 100 people."

A psychiatrist testified that from personal examination and study of defendant's medical records and Harmony House records, listening to the confession tape, and discussions with defendant's jailer, he concluded that defendant "had mental difficulties," short of insanity, which primarily involved a "definite propensity to go along with whatever events were happening at the time."

The court sustained the State's objection to further questioning regarding whether it would have been easier for this defendant to have fired the shotgun if he had believed that the victims were already dying. Defendant's offer of proof was that the defendant, in the psychiatrist's

opinion, would have been more apt to fire the fatal shots under those circumstances. The State's motion *in limine,* which was granted, prevented the psychiatrist from testifying, according to the offer of proof, that defendant was not likely to have volunteered information other than what was asked at his in-custody interrogation.

We face an initial difficulty in reviewing the jury's sentence because of the evidence of compulsion. It is true, of course, that defendant's testimony on this point did not duplicate his in-custody statement. Normally we defer to the jury's superior opportunity to resolve such conflicts. But here we do not know whether the jury disbelieved defendant's compulsion evidence or whether it regarded compulsion as a mitigating factor insufficient to preclude execution.

If compulsion had been available to the defendant at the trial as a defense to the murder charge, we would know whether the jury believed defendant's evidence. Only if it had not believed it, would defendant have been found guilty of murder. Similarly, if our death penalty statute were structured so that a finding of one mitigating factor precluded a death sentence, the imposition of such a sentence in this case would constitute conclusive evidence that the jury believed that Gleckler shot the victims voluntarily—although we would not know whether that finding was attended by a reasonable doubt.

This difficulty is not merely academic. In reviewing a sentence under the circumstances presented here we must note the evidence presented in the related but separately conducted trials. Neither Kirkpatrick nor Parsons testified at Gleckler's trial.

Kirkpatrick testified at his own trial, however, that he heard Gleckler refuse Parsons' orders to shoot the victims, although his arrest statement was generally consistent with Gleckler's arrest statement. (*People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 169-70.) At Parsons'

sentencing hearing it was revealed that previously he had committed an armed robbery in California; the officer testifying at that sentencing hearing quoted the complaining witness as saying that he heard Parsons order his accomplice to shoot him.

The State, in seeking to uphold the sentence, argues that Gleckler's sentence was imposed by a jury and a trial court that did not abuse their discretion, citing *People v. Perruquet* (1977), 68 Ill. 2d 149, *People v. Allen* (1974), 56 Ill. 2d 536, *cert. denied* (1974), 419 U.S. 865, 42 L. Ed. 2d 102, 95 S. Ct. 120, *People v. Sprinkle* (1974), 56 Ill. 2d 257, *People v. Taylor* (1965), 33 Ill. 2d 417, and *People v. Hampton* (1969), 44 Ill. 2d 41, and further argues that codefendants can receive disparate sentences when "the sentence was within the statutory limits for the offense and the trial court could have considered other relevant factors concerning defendant's conduct," citing *People v. Spears* (1971), 50 Ill. 2d 14, 18, and *People v. Fuca* (1969), 43 Ill. 2d 182. We do not deem these holdings to represent an attempted limitation on this court's duty to ensure that the cases in which death is imposed are rationally distinguished from those in which it is not imposed. Indeed, none of the cited cases even involved the death penalty.

Thus, the State argues: "Most importantly, Defendant admits in his brief [that] *he* fired the shots that fatally wounded the victims." (Emphasis in original.) We interpret this statement as a contention that Gleckler was more culpable than Parsons and reject it. Parsons first shot the victims in the back with the intent to kill them and was convicted of the double murders. It was Parsons who made the apparently unilateral decision to force the victims off of the road and who first ordered them out of their car. And if Gleckler's compulsion evidence were believed, there would be no doubt that Parsons was more culpable than Gleckler.

In a secondary argument, the State, citing *United States v. Grayson* (1978), 438 U.S. 41, 57 L. Ed. 2d 582, 98 S. Ct. 2610, argues that inconsistencies between defendant's trial testimony and his in-custody statement to the police justify his execution. A conclusion of testimonial untruthfulness is relevant, as the *Grayson* court held, in determining a defendant's attitude toward society and his or her rehabilitative prospects. (*United States v. Grayson* (1978), 438 U.S. 41, 50-51, 57 L. Ed. 2d 582, 590, 98 S. Ct. 2610, 2616; see also *People v. Jones* (1972), 52 Ill. 2d 247; *People v. Meeks* (1980), 81 Ill. 2d 524.) Unlike *Grayson, Jones* and *Meeks,* however, no finding that the defendant perjured himself at trial has been made. In any event, our inquiry here involves a proportionality review.

We consider Parsons' sentence of imprisonment relevant to that inquiry. Parsons, 20 years old, submitted mitigating evidence showing that his childhood home was acutely discordant. The State presented evidence in aggravation of his prior conviction in California for grand theft. This was the incident, previously mentioned, where there was evidence that he ordered his accomplice to shoot the victims. He was originally charged with armed robbery and kidnapping with the intent to commit robbery, but these charges were reduced to grand theft pursuant to a plea bargain, and Parsons was sentenced to six months in jail and three years of probation. Further evidence in aggravation was Parsons' shooting of the gas station attendant the night before the crimes at issue here.

The jury heard this evidence and could not agree to impose death. At the sentencing hearing, the court heard arguments from both sides and imposed concurrent prison terms of 500 to 1,000 years. The court explained its decision:

"In cases involving crimes of the nature of the one that the defendant stands convicted, courts are sometimes

wont to apply a number of adjectives to the crime. I think it's sufficient to say that I have heard the evidence in this case three times and the horror of what happened last September 25th, 1977, will remain with this Court for a long time and I believe that I've had the opportunity to consider and think about every possible mitigating factor whether provided under the old law or the new or which would be dictated by common sense and I find nothing to mitigate the defendant's crime and therefore his sentence. I believe it is correct that the Court must make a clear statement to those who would review this matter in time and by the sentence of the trial court I believe it should be indicated to the persons who will review this at some future date by way of parole that they should perhaps read the record in this case and very possibly the response of anyone who would read this record would be, not now and not ever. I think the defendant has proven, and, of course, we can't speculate about the future as far as possibility for rehabilitation is concerned, we can only deal with what we know, but at some point we have to look at the facts, and the facts in this case show that the defendant had his opportunity and that any possibility for rehabilitation is so slight as to not bear any weight or only a very, very small amount of weight in any consideration of the Court. Considering the nature of the crimes and considering that I find nothing to mitigate the defendant's conduct, not one single thing, and considering that the Prisoner Review Board must somehow be signaled by any sentence that this is a matter of years down the road that should deserve their serious consideration before anything is ever done with respect to the release of this man and considering the need to protect the public from the type of crimes that Mr. Parsons has indicated he can so wantonly commit, realizing that the number of years when they become so high probably in and of themselves lose some credibility, I think nevertheless the Court has to say something about this crime, and accordingly the sentence of the Court will be that the defendant, and the record should show, is hereby sentenced to the Department of Corrections on the judgment on the verdict of guilty of the murder of Mark Harris to an indeterminate term and the minimum of said term is hereby fixed at 500 years and maximum is hereby

fixed at a thousand years, and show that the defendant is hereby sentenced to the Department of Corrections on the judgment of the verdict of guilty of the murder of Douglas Scott Simmons for an indeterminate term and the minimum of said term is hereby fixed at five hundred years and the maximum of said term is hereby fixed at a thousand years, said sentences to run concurrently with each other, said sentences to run consecutively to a sentence or sentences heretofore imposed in cause number 77—CF—224 in Vermilion County, Illinois."

In *People v. Walcher* (1969), 42 Ill. 2d 159, a case cited by neither party, the defendant was convicted of murder and sentenced to death. The evidence showed that the defendant, while on parole following imprisonment for a forgery conviction, met two ex-convict friends who suggested he commit an armed robbery of a liquor store. The defendant was an alcoholic, and all three had consumed alcohol that day. In the course of the robbery, defendant testified, the store proprietor grabbed at the gun he held. The defendant testified that the gun fired not "of his own volition" and went off twice more in the ensuing struggle. The proprietor's wife testified that defendant fired one shot as her husband began turning toward the cash register; following that shot her husband fell against or pushed the defendant and, after both men went through the store doorway, a second and final shot was fired. The store proprietor died from his wounds.

The court held that the "record does not show the [defendant] to have been intoxicated," and that his responsiveness to suggestion after drinking did "not exempt [him] from criminal responsibility." (42 Ill. 2d 159, 163.) However, the court held:

"[C]onsidering all of the circumstances of this case, that the penalty should be reduced to a sentence for a term of years. It is clear from the record that the appellant is and has been for a considerable number of years an alcoholic. We do

not mean to suggest that such a person, without more, does not have the capacity to commit crime but we judge the condition is a circumstance to be considered in determining punishment in this case. The record of the Decatur police department discloses some 35 notations of appellant's having been arrested or 'picked up' for investigation. Eight of the notations unmistakably are related to drinking. It cannot be said how many of the other notations, such as 'disorderly conduct,' 'vagrancy,' 'investigation,' 'window peeping' and 'trespassing' may have involved drinking by the appellant. One arrest record for disorderly ·conduct, when the appellant was 17 years of age, notes that he 'continually frequents the taverns and was told by the officer to go home on three different occasions and on the last time, told the officer to go to hell.' Materials in the record from the Illinois Department of Public Safety reflect that he received an undesirable discharge from the Army because of drunkenness and disorderly conduct. They contain entries, too, such as 'chronic and acute alcoholism. Doubtfully improvable offender'; '*** very inadequate dependent alcoholic ***. The prognosis is doubtful.'

After considering all the circumstances of this crime and the offender we deem that the sentence of death imposed by the trial court would be inappropriate." 42 Ill. 2d 159, 166.

Unlike that case, the defendant here killed two individuals and did not do so in the context of a struggle. On the other hand, in *Walcher* the proprietor's wife testified that the first shot was fired before any struggle and there was no evidence of compulsion. Gleckler, moreover, had never before been imprisoned or on parole and had not had the numerous brushes with the law which character-

ized the defendant in *Walcher.*

A reviewing court may well be unable to perfectly implement both the Supreme Court's command to prevent the arbitrary imposition of capital punishment and the public's demand to execute loathsome criminals. (See Dix, *Appellate Review of the Decision to Impose Death,* 68 Geo. L.J. 97 (1979).) But that possibility will not excuse a lack of effort. Judicial review is not an idle function, and this court has always reduced death sentences where the circumstances seemed to so warrant.

In *People v. Walcher* (1969), 42 Ill. 2d 159, we did so in circumstances similar to this case. And from the record here it can be seen that Gleckler, with no criminal history, the personality of a doormat, and a problem with alcohol, was not the ringleader in this sordid affair; nor are his rehabilitative prospects demonstrably poorer than those who received imprisonment terms. Our revulsion toward this crime and our lack of sympathy for Gleckler cannot justify executing only him.

The convictions are affirmed but the death sentence is vacated and the cause remanded to the circuit court of Champaign County with directions to impose a sentence upon defendant other than death.

*Judgment affirmed; death sentence*
*vacated; cause remanded,*
*with directions.*

MR. JUSTICE RYAN, specially concurring:

I agree with the view expressed by Mr. Justice Underwood in his dissent and would join therein except for my belief that our death penalty statute is unconstitutional as expressed in my dissent in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531. Because of my belief I cannot join in Mr. Justice Underwood's dissent; however, I do not believe that the death penalty should be vacated for the reasons set forth in the opinion.

172

MR. JUSTICE UNDERWOOD, concurring in part and dissenting in part:

I agree that the murder convictions should be affirmed. I cannot agree that the death sentence should be vacated. In view of the inconsistencies between defendant's statements at the time of his arrest and his trial testimony, coupled with his failure to mention to the police in his original statement the compulsion to which he later testified, the jury may well have regarded as a total fabrication his testimony that he was compelled by Parsons to shoot the two boys. We can never know the precise reasons for the jury's verdict, but it seems not unreasonable that it was, in part at least, influenced by the belief that defendant lied. Absent any compulsion, defendant's callous and brutal action in shooting each of the boys twice in the back of the head with a shotgun at close range seems to me to eliminate any problem of disproportionality. I would affirm the death sentence.

MR. JUSTICE WARD joins in this partial concurrence and partial dissent.