UNITED STATES of America ex rel. Fred REED, Petitioner,

v.

Michael LANE, Director, Illinois Department of Corrections and James Greer, Warden, Menard Correctional Center, Respondents.

No. 83 C 3622.

United States District Court, N.D. Illinois, E.D.

Oct. 3, 1983.

Steven Clark, Deputy Defender, Scott Graham, Asst. Appellate Defender, Chicago, Ill., for petitioner.

Neil F. Hartigan, Atty. Gen. of Ill., Kenneth A. Fedinets, Asst. Atty. Gen., Chicago, Ill., for respondents.

SHADUR, District Judge.

MEMORANDUM OPINION AND ORDER

Fred Reed ("Reed") has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  For the reasons stated in this

---

1. Reed has been represented from the outset by   the State Appellate Defender, whose well-

memorandum opinion and order, Reed's petition is granted.

## Facts [2]

As the result of his participation in two killings and a related robbery, Reed was convicted of two counts of murder and one of armed robbery. All his available state court remedies have been exhausted, and he is now serving concurrent prison terms of 50 to 100 years for each murder and 20 to 30 years for armed robbery.

According to the trial testimony one of the murder victims, Michael Robbins ("Robbins"), was killed over a narcotics trafficking territorial dispute involving Robbins, Lonnie Hall ("Hall") and others. About 10:30 p.m. August 28, 1977 Hall came into Reed's apartment with a gun and told Reed he wanted to use Reed to gain entry into Robbins' apartment (Robbins lived in the courtway right next to Reed's apartment). Hall threatened Reed, telling him to accompany Hall to Robbins' place or Reed "would come up dead." They went to Robbins' apartment, Reed knocked and identified himself, and Robbins opened the door. Hall forced his way into the apartment, ordered Robbins to lie down on the bed and told Reed to tie him up. Reed tied Robbins' legs and Hall tied his hands. Hall then covered Robbins' head with a pillow and shot him twice.

As Hall and Reed left Robbins' apartment Beverly Truitt ("Truitt") opened her door and asked what happened. Hall pushed her back into her apartment and shot her twice. When Hall came out of her apartment he had some jewelry. At Reed's request Hall gave him three or four rings, a bracelet and necklace.

## Reed's Constitutional Claim

■ Reed claims constitutional error in the trial court's refusal to give a tendered jury instruction on the affirmative defense of compulsion. Under Ill.Rev.Stat. ch. 38, § 7–11(a) ("Section 7–11(a)"):

> A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct.

Section 7–11(a) and its permissible reading are the focus of this action.

In respondents' answer here the State maintains (as it did in the state courts) Reed was not entitled to the compulsion instruction because he committed "an offense punishable with death." [3] Here as in the state courts, Reed counters such a construction of Section 7–11(a) was constitutionally impermissible, because Reed was compelled to help commit Robbins' murder at a time when Reed had not yet come within the statutory "punishable with death" exception.

---

presented supporting and reply memoranda have been sandwiched around the Attorney General's memorandum in support of his answer to the petition. This Court has also been favored with the brief filed by the Appellate Defender on Reed's behalf in his state court appeal.

2. Except for the critical facts as to the alleged threat under which Reed acted (taken from the trial transcript), this is essentially a bobtailed version of the facts summarized by the Illinois Appellate Court in *People v. Reed,* 104 Ill. App.3d 331, 60 Ill.Dec. 80, 432 N.E.2d 979 (1st Dist.1982). Leave to appeal was denied by the Illinois Supreme Court April 12, 1982.

3. In relevant part the Illinois death penalty statute, Ill.Rev.Stat. ch. 38, § 9–1(b)(3) ("Section 9–1(b)(3)"), provides:

> A defendant who at the time of the commission of the offense has attained the age of 18 or more and who has been found guilty of murder may be sentenced to death if: ...
> 3. the defendant has been convicted of murdering two or more individuals under Subsection (a) of this Section or under any law of the United States or of any state which is substantially similar to Subsection (a) of this Section regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts....

In affirming Reed's conviction, the Illinois Appellate Court rejected his proposed reading of Section 7–11(a). 104 Ill.App.3d at 337–39, 60 Ill.Dec. at 85–86, 432 N.E.2d at 984–85. This Court is bound by that construction in state law terms. *Israel v. Odom,* 521 F.2d 1370, 1376 (7th Cir.1975); *United States ex rel. Hanrahan v. Bosse,* 547 F.Supp. 718, 720–21 (N.D.Ill.1982).

At this point, then, the question is whether that binding construction of Section 7–11(a) denied Reed due process under the Fourteenth Amendment. Reed contends:

1. At the time he admittedly participated in Robbins' murder, Reed had committed no prior murder. Therefore the Robbins murder could not have involved the quality of intent or conduct necessary for sentencing Reed to death under Section 9–1(b)(3).

2. At the time of the Robbins murder Reed could not reasonably have anticipated Hall's later murder of Truitt. That later murder cannot be the retroactive predicate for making Reed's involvement in the earlier offense punishable by death.

Essentially Reed relies on the principle that due process requires a person to be fairly apprised of criminal consequences *at the time he acts*—in this case at the time he reacted to the compulsion he claims Hall visited upon 'him immediately preceding Robbins' murder. If such notice is not fairly given by a statute, that statute is deemed unconstitutionally vague under the standard of *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954):

> The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.

Of course every such argument relies on a fiction: the notion that a person bent on criminal activity is indeed aware of what the law provides, as though the potential murderer carries a copy of the Illinois Criminal Code with him (or has it committed to memory). But it is a necessary fiction if the concept of *mens rea* is not to be subverted.[4] This Court then must look at what Reed was fairly apprised of at the time he was confronted with the decision of how to act in the face of Hall's menace to his own life.[5]

In terms of that necessary fiction, had Reed looked at the statute when forced to decide what action to take in conjunction with Robbins' murder, he would have known from the plain statutory language the compulsion defense was available to him. Under that defense Reed could yield to Hall's death threat without putting his own life in jeopardy (via a potential death sentence) by so yielding.[6] That was the legal matrix in which Reed was entitled to make his decision about what action to

---

4. This case is perhaps not quite like those in which (say) vague vagrancy statutes or ordinances are invalidated on the ground no reasonable person could know the conduct was criminal at all. *Papachristou v. Jacksonville,* 405 U.S. 156, 92 S.Ct. 839, 31 L.Ed.2d 110 (1972). After all, everyone knows participating in a killing is in all likelihood a criminal act (*malum in se* rather than *malum prohibitum*). But on reflection the parallel is not so farfetched, for it is not really so obvious that participating in a killing while in fear for your own life is necessarily criminal.

5. This Court of course makes no factual judgment as to the claimed threat to Reed's life, for this Court is not the finder of fact. Rather the question is whether the *jury* should have been told that acting under such threat—if it believed the evidence—would render Reed not guilty.

6. In the course of deciding the legislative intent underlying Section 7–11(a), *People v. Gleckler,* 82 Ill.2d 145, 160, 44 Ill.Dec. 483, 490, 411 N.E.2d 849, 856 (1980) twice essentially acknowledged the statute's literal meaning was that indicated in the text of this opinion. For that reason *Gleckler* limited its elimination of the compulsion defense for *all* murder prosecutions to apply only *prospectively*. Those factors provide an effective confirmation of the fundamental unfairness of saddling Reed with such a skewed and forced reading of the statute.

take. What was surely not obvious from the face of the statute and then-existing case law [7] was that a *later* event—Hall's gratuitous murder of Truitt—would deprive Reed of the compulsion defense on the theory that *as a whole* two or more murders are punishable by death.

Now the Illinois Appellate Court has taught Section 7–11(a) must be read that latter way. That gloss on the statute binds this Court as a matter of statutory construction. It does not however bind this Court as to the constitutional effect of that construction. Under the standard enunciated in *United States v. Batchelder,* 442 U.S. 114, 123, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979), the language of the Illinois statute—as contrasted with its post-hoc interpretation by the Illinois courts—did not "state with sufficient clarity the consequences of violating a given criminal statute." Accordingly this Court holds Section 7–11(a), with the patina added by the Illinois courts, is unconstitutionally vague in due process terms as to Reed.[8]

That due process deprivation impacted on Reed by the trial court's refusal to give the requested instruction as to compulsion (an instruction that would have conformed to the statute's natural meaning without the constitutionally flawed reading). In an effort to avoid that conclusion, respondents have advanced two further arguments:

1. There is insufficient evidence of compulsion in the record to warrant an instruction on the issue.

2. Even were that no so, failure to give the instruction did not result in a "fundamental miscarriage of justice."

■ On the first issue, the "come up dead" testimony was plainly enough on its own to raise the compulsion defense. Once the issue was raised by the evidence, the state court was obligated to instruct the jury on the affirmative defense of compulsion. *People v. Wallace,* 100 Ill.App.3d 424, 430, 55 Ill.Dec. 692, 698, 426 N.E.2d 1017, 1023 (1st Dist.1981).[9]

■ As for respondents' second argument, it cannot be blinked that the jury's unawareness of a compulsion defense subjected Reed to a conviction of Robbins' murder that would not have occurred had the jury credited and given full effect to the "come up dead" testimony. In conjunction with the Truitt conviction,[10] Reed was

---

7. *Gleckler's* prospective application further narrows the likelihood the present decision (with its unusual facts) will have any meaningful effect on any other cases.

8. This ruling should be distinguished from a holding that Reed was constitutionally entitled to a defense that he had acted under compulsion. This Court is not suggesting the Illinois Supreme Court's decision in *Gleckler* (see n. 6), making that defense unavailable to any murderer, was itself unconstitutional (or that a like action by the Illinois General Assembly would be constitutionally suspect). Nor does this Court find Reed to have been denied equal protection simply because all other one-time murderers were accorded a compulsion defense under Illinois law, for the record is devoid of any suggestion the State was motivated by any discriminatory animus toward Reed. Rather the constitutional problem is that the reasonable person in Reed's position could not fairly have known, at the time he was called upon to choose a course of action in response to a death threat (the making of which must be accepted for current purposes), that Sections 7–11(a) and 9–1(b)(3) would be read in the tricky, mirrored-back way that eliminated the compulsion defense retrospectively.

9. It will not do for respondents to argue (Mem. 9–10) their own inferences about the reality of Hall's threat. They are not the triers of fact any more than this Court. For aught that appears the uninstructed jury could reasonably have believed the story about Hall's threat, believed Reed was acting in fear of "death or great bodily harm," yet felt that fear *still* could not justify participation in a callous murder. Such a frame of mind on the part of the jury would have resulted in the guilty verdict it returned. It is plain the refused compulsion instruction *could* reasonably have tipped the scales for acquittal. *Wallace* itself teaches "that very slight evidence upon a given theory of the case will justify the giving of an instruction."

10. Reed's conviction of this second murder was also affirmed by the Illinois Appellate Court, though a reading of its opinion leaves the feeling it was Reed's unfeeling sharing in the fruits of Hall's wanton killing of Truitt, more than any involvement in the offense itself, that contributed to that result.

thus exposed to a potential death penalty—a result that would not have obtained on a conviction as to Truitt alone.

Such "risk enhancement" is strongly redolent of the situation dealt with in *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), where failure to give an instruction on a lesser-included offense enhanced the defendant's risk of being convicted of a capital offense. What the Court said in *Beck*—the principle that prompted its decision—applies with equal force here (*id.* at 637–38, 100 S.Ct. at 2389–90, footnotes omitted):

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense—but leaves some doubt with respect to an element that would justify conviction of a capital offense—the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments:

> "[D]eath is a different kind of punishment from any other which may be imposed in this country.... From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 357–358 [97 S.Ct. 1197, 1204,

51 L.Ed.2d 393 (1977)] (opinion of Stevens, J.).

To insure that the death penalty is indeed imposed on the basis of "reason rather than caprice or emotion," we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination. Thus, if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case.

That enhancement of risk—for Reed was in fact potentially subjected to a death sentence, though the trial court's ultimate decision was to impose a 50- to 100-year term—effectively distinguishes Reed's situation from the line of cases applying a more stringent standard to the usual erroneous jury instruction or the usual erroneously omitted jury instruction.[11] See the discussion in *Nichols v. Gagnon*, 710 F.2d 1267, 1269–72 (7th Cir.1983). Indeed, under the circumstances of this case, the omission of the compulsion instruction satisfied that more stringent test of "fundamental miscarriage of justice" announced in such cases as *Nichols*.

### Conclusion

Reed's petition for writ of habeas corpus is granted. Respondents are ordered to discharge Reed unless the State of Illinois gives him a new trial within a reasonable time (which, absent a showing by respondents, shall be conclusively deemed to require retrial within 120 days).

---

11. It is a familiar truism that much of our criminal constitutional law is generated by cases involving (perhaps an understatement) unsavory people who have committed abhorrent offenses. That fact, perhaps coupled with the desire (even subconsciously) not to be "soft on crime," may largely contribute to the current tendency to expand notions of "harmless error." But what *Beck* teaches is that by definition the omission of an instruction that enhances the risk of a death sentence cannot be harmless.