THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERTO HAYNIE, Defendant-Appellant.

First District (6th Division)   No. 1—01—4427

Opinion filed March 26, 2004.

Michael J. Pelletier and Andrew J. Harger, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Alan J. Spellberg, and Lindsay M. Shuman, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE O'MARA FROSSARD delivered the opinion of the court:

After a jury trial, defendant was found guilty of the first degree murders of Ruben Pulido and Mark Lopez. Defendant was 16 years old at the time of the double homicide. The trial court sentenced defendant to natural life in prison. On appeal defendant contends as follows: (1) he was denied effective representation by counsel because his trial counsel failed to file a motion to suppress his statements; and (2) he was denied a fair trial because he was precluded from using compulsion as a defense. We affirm.

## BACKGROUND

On June 29, 2000, the victims, Ruben Pulido and Mark Lopez, were playing basketball with their friends. Both boys were 13 years

old. Around 10 p.m. Pulido and Lopez joined their friends on Arturo Nurgaray's front porch at 1639 South 58th Court. A boy on a bike rode up and told the group on the porch that "this was Rocho's hood." Nurgaray said "we don't care" and told the boy not to "disrespect" in front of his house. The boy threw down his bike and yelled to defendant to "light 'em up." Defendant, who was directly across the street, pulled a gun and began firing at the porch. Defendant and the other boy on the bike rode off. Pulido and Lopez died from gunshots. Various witnesses were able to identify Juan Casillas as the boy on the bike who told the shooter to "light 'em up." Casillas was arrested on June 30, 2000. The police investigation led to the arrest of defendant also on June 30, 2000.

Medical examiner Dr. An concluded that both Lopez and Pulido died from gunshot wounds to the back. Firearms expert Kurt Zielinski analyzed two bullet fragments from the crime scene. Both bullets were .22 caliber and Zielinski came to the inconclusive finding that both bullets were fired from the same gun.

Assistant State's Attorney Peter Troy arrived at the police station shortly after 10 p.m. on June 30, 2000. Troy told defendant they were trying to contact his mother. At around 3 a.m., when defendant's mother arrived at the police station, Troy told her that her son was a suspect in a double homicide. Troy told her that he wanted to speak with defendant with her present. Defendant's mother, Troy, and Detective Rudy Sirgedas, the youth officer, were present for the interview with defendant, which lasted about 15 minutes. After the interview, defendant agreed to give a videotaped statement.

In his statement defendant related that as he and Casillas pulled up at 58th Court, they saw a group of people. Casillas was on his bike and started talking gang slogans. Casillas gave defendant the order to "light these motherfuckers up." Defendant stated that he got off his bike and shot four times toward the porch where the people were sitting. Then he and Casillas got on their bikes and rode away.

The defense called Detective Sirgedas as a witness. He explained the requirements of becoming a youth officer and described what he did on behalf of defendant. He explained that a youth officer notifies parents when a juvenile is in custody, ensures that the juvenile is not mistreated, and ensures the juvenile is kept away from adult offenders. He testified that he was involved in the case, both as a detective and as a youth officer. He stated that he investigated this case as a detective, but acted as a youth officer during the interview of defendant. The defense rested.

Defendant was found guilty of the first degree murders of Mark Lopez and Ruben Pulido. Defendant's motion for new trial was denied.

The trial court sentenced defendant to natural life in prison. This appeal followed.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ Defendant argues trial counsel was ineffective for failing to file a motion to suppress his statement. The issue is whether defense counsel's performance was deficient and if there is a reasonable probability that his deficient performance affected the outcome of trial. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984). In the context of this case, in order to prevail on the issue of ineffectiveness, the defendant must demonstrate the following: (1) the motion would have been granted; and (2) the outcome of the trial would have been different had the evidence been suppressed. *People v. Morris*, 229 Ill. App. 3d 144, 157 (1992).

In the instant case, if the motion were granted, defendant would have been found not guilty because his statements provided the evidence of his guilt. None of the witnesses identified defendant as being involved in the shooting. In the context of this case, the outcome of the trial would have been different had a motion to suppress statements been granted by the trial court. We, therefore, focus our analysis on whether the motion to suppress would have been granted if filed by trial counsel.

■ In determining the voluntariness of a confession, the court considers the totality of the circumstances including the defendant's age, intelligence, background, experience, mental capacity, education, physical condition, experience with the criminal justice system, legality of the detention, duration of the detention, duration of questioning, promises, threats, deceit, and physical or mental abuse by police. *People v. Gilliam*, 172 Ill. 2d 484, 500-01 (1996). Additional factors are considered important in determining the voluntariness of a confession by a juvenile, including whether a parent or other interested adult was present. No one factor is dispositive.

■ The Juvenile Court Act of 1987 requires a law enforcement officer who takes a juvenile into custody to immediately make reasonable efforts to notify the parent and, without unnecessary delay, to take the juvenile to the nearest juvenile police officer. 705 ILCS 405/ 5—405 (West 2000). The Illinois Supreme Court has recognized that because taking a juvenile's confession is a sensitive concern, the greatest care must be taken to assure the confession was not coerced or suggested and that " ' "it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." ' [Citations.]" *In re G.O.*, 191 Ill. 2d 37, 54 (2000). The absence of a parent or youth officer is one factor to consider. Regarding voluntariness, of critical importance

is whether the absence of an adult interested in the defendant's well being fostered a coercive environment surrounding the interrogation. *People v. Pogue*, 312 Ill. App. 3d 719, 728 (1999).

Defendant contends his age, the length of detention, and potential lack of sleep rendered his confession involuntary. In the instant case, defendant was taken to the station around 7 p.m. He participated in three lineups. Within 20 minutes of arriving at the station, several attempts were made to locate defendant's mother. Defendant was placed in the deputy commander's office. He was not handcuffed or placed in a holding cell. He was isolated from adult offenders. Although Assistant State's Attorney Troy arrived around 10 p.m., defendant was not questioned until his mother arrived. Several hours passed before defendant was questioned because his mother could not be found. After several attempts, defendant's mother was contacted at 1 a.m., but she did not arrive at the police station until approximately 3 a.m.

When defendant's mother arrived around 3 a.m., Troy advised her that defendant was a suspect in a double homicide and that he wanted to speak with defendant in her presence. Defendant's mother, Troy, and Detective Sirgedas, the youth officer, were present for the interview, which lasted about 15 minutes. Defendant agreed to have his statement videotaped.

Defendant further argues that the fact Sirgedas served as youth officer and investigator rendered his role as youth officer meaningless. Sirgedas initially participated in the investigation by interviewing witnesses and conducting lineups; however, his role changed to youth officer once defendant was brought to the police station. The duties of a youth officer include notification of defendant's parents, ensuring *Miranda* rights are given to the juvenile, and ensuring the juvenile is not coerced in any way. *People v. Williams*, 324 Ill. App. 3d 419, 429-30 (2001). The record reflects that Sirgedas satisfied the duties of youth officer as follows: (1) he ensured defendant's mother was notified; (2) he ensured defendant was given his *Miranda* rights; (3) he kept defendant separated from adult offenders; and (4) he ensured defendant was not coerced.

■ Regarding defendant's age, we note the Illinois Supreme Court upheld the confession of a 14-year-old as voluntary in *People v. Morgan*, 197 Ill. 2d 404, 440 (2001). No single factor but, rather, the totality of the circumstances determines the voluntariness of a confession. Moreover, the failure to file a futile motion is not ineffective assistance of counsel. *People v. Lewis*, 88 Ill. 2d 129, 156 (1981). Based on the totality of the circumstances, we conclude the filing of a pretrial motion to suppress statements in the instant case would not have been granted as defendant's confession was voluntary. In light of that

conclusion, we find no ineffective assistance of counsel in the instant case as the result of defense counsel's decision not to file a motion to suppress statements.

## COMPULSION DEFENSE

Defendant contends he was denied a fair trial because he was not allowed to present a compulsion defense. Defendant acknowledges that the Illinois Supreme Court in *People v. Gleckler*, 82 Ill. 2d 145 (1980), held that compulsion is a prohibited defense in first degree murder cases. However, defendant argues that he was not charged with an offense punishable by death because he was under 18 years of age at the time of the offense, which rendered him ineligible for the death penalty. 720 ILCS 5/9—1(b) (West 2000).

Before trial, defendant indicated he was planning to rely on the affirmative defense of compulsion. The State filed a motion *in limine* to prohibit defendant from using the compulsion defense at trial. The trial court granted the State's motion *in limine*.

■ The Illinois Criminal Code of 1961 (Code) indicates that in all cases except those punishable by death, a defendant can use compulsion as a defense and provides in relevant part as follows:

> "(a) A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." 720 ILCS 5/7—11 (West 2000).

■ Defendant contends that the *Gleckler* holding should not apply in the instant case because he is under 18 years of age. We note the court in *Gleckler* recognized that "[t]he legislative desire to permit the discretionary imposition of the death penalty in 1867 cannot be transformed into an intent to allow the defense of compulsion in any murder case." *Gleckler*, 82 Ill. 2d at 156. Regarding the charge of murder, the Illinois Supreme Court recognized in *People v. Brownell*, 79 Ill. 2d 508, 527 (1980), "[t]here is no offense of 'aggravated,' as opposed to simple, murder, in Illinois. There is simply one murder statute, which includes within it a provision for the imposition of the death sentence."

Thus, it is not the age of the murder defendant that is determinative regarding the compulsion defense but, rather, the fact that the defendant has been charged with an offense punishable by death. The defendant, based on his age, is not eligible for the death penalty; however, he is not entitled to use the compulsion defense because he is charged with offenses punishable by death. As noted in *Gleckler*, the legislative intent to permit the discretionary imposition of the death

penalty does not demonstrate a legislative intent to allow the defense of compulsion in any murder case. *Gleckler*, 82 Ill. 2d at 156. Regarding the legislative intent behind the statutory defense of compulsion, the court in *Gleckler* further noted: "[A]s evidenced by the committee comments [citation], this State, in enacting this provision, intended to apply the common law rule that one ought himself to die rather than escape through the murder of an innocent." *Gleckler*, 82 Ill. 2d at 156.

■ Defendant also contends that this court "should avoid interpreting section 7—11(a) of the Criminal Code as prohibiting the compulsion defense in this case because such an interpretation would offend [his] right to due process." Defendant essentially argues that the prohibition against sentencing minors to death included in section 9—1(b) of the Code provided him a reasonable basis for concluding he would be entitled to assert a compulsion defense pursuant to section 7—11(a) of the Code in an effort to establish that his conduct was legally justified in the instant case. Whether a statute is constitutional is a question of law to be reviewed *de novo*. *People v. Morgan*, 203 Ill. 2d 470, 486 (2003).

■ "It is a fundamental tenet of due process that '[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes.' [Citation.] A criminal statute is therefore invalid if it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.' [Citations.]" *United States v. Batchelder*, 442 U.S. 114, 123, 60 L. Ed. 2d 755, 764, 99 S. Ct. 2198, 2203-04 (1979).

■ The plain language of section 7—11(a) of the Code states that a defendant is not guilty of an offense "other than an offense punishable by death" if he can establish a defense of compulsion. 720 ILCS 5/7—11(a) (West 2000). This language unambiguously reflects that a defendant may assert a defense of compulsion against any offense with which he is charged except an offense that is potentially punishable by death. Section 7—11(a), thus, conditions the right to assert a compulsion defense not upon whether the specific defendant charged may be sentenced to death but, rather, upon the nature of the offense charged and whether it is potentially punishable by death. In the instant case, defendant was charged with an offense punishable by death, namely, first degree murder. The fact that defendant's age rendered him ineligible for the death sentence does not alter the nature and seriousness of the offense with which he was charged or the fact that the legislature chose to make that offense potentially punishable by death. Accordingly, we conclude that section 7—11(a) of the Code does provide fair notice that a defendant may not assert a defense of compulsion anytime he is charged with an offense

potentially punishable by death, regardless of whether the defendant's age renders him ineligible for that sentence. The application of section 7—11 to defendant in the instant case did not constitute a violation of due process.

For the reasons previously discussed, we affirm the trial court's ruling refusing to allow defendant to present a compulsion defense where he was charged with an offense punishable by death.

Affirmed.

GALLAGHER and FITZGERALD SMITH, JJ., concur.