# ILLINOIS OFFICIAL REPORTS

---

### *People v. Anderson*, 2011 IL App (1st) 071768

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES ANDERSON, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1–07–1768 |
| Filed | June 27, 2011 |
| Rehearing denied | July 28, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first degree murder under an accountability theory and aggravated battery were affirmed, where defendant did not object to the trial court's violation of Rule 431(b) and the error did not rise to the level of plain error where the evidence against defendant was overwhelming, defendant failed to present a reasonable probability that, but for defense counsel's error in not presenting a compulsion defense, the result would have been different, and defendant waived his objections to the alleged improper impeachment and prosecutorial misconduct arising from the prosecution's personal commentary on the credibility of defendant and his codefendant, and the same overwhelming evidence of defendant's guilt precluded a finding of plain error. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 04–CR–7764; the Hon. Diane Gordon Cannon, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal        Michael J. Pelletier, Patricia Unsinn, and Brian E. Koch, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg, Clare Wesolik Connolly, and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

Panel        JUSTICE LAMPKIN delivered the judgment of the court, with opinion.
Presiding Justice Hall and Justice Garcia concurred in the judgment and opinion.

**OPINION**

¶ 1        In compliance with the supreme court's supervisory order, we have vacated our prior judgment in *People v. Anderson*, 399 Ill. App. 3d 856, 927 N.E.2d 121 (2010), and reconsidered this case in light of *People v. Thompson*, 238 Ill. 2d 598, 939 N.E.2d 403 (2010). See *People v. Anderson*, 239 Ill. 2d 557, 940 N.E.2d 1151 (2011) (table).

¶ 2        The amended Illinois Supreme Court Rule 431(b) went into effect on May 1, 2007. Jury selection in the case against defendant, James Anderson, began three weeks later, on May 21, 2007. The jury found defendant guilty, under an accountability theory, of first degree murder and aggravated battery with a firearm.

¶ 3        On appeal, defendant contends: (1) the trial court failed to comply with Rule 431(b) (Ill. S. Ct. R. 431(b) (eff. May 1, 2007)) in conducting *voir dire* and his convictions should be reversed for another trial as a result; (2) his trial counsel was ineffective for presenting a compulsion defense; (3) he was prejudiced because the State conducted improper impeachment; and (4) he otherwise suffered prejudice as a result of prosecutorial misconduct. Based on the following, we affirm defendant's convictions and sentence.

¶ 4                                FACTS

¶ 5        Briefly stated, on May 3, 2003, defendant agreed to drive codefendants Christopher Washington and Sheldon Smith to a neighborhood where codefendants shot three individuals. Two of the victims were injured and one died.

¶ 6        According to defendant's trial testimony, codefendants merely asked him to drive them to obtain marijuana. Defendant testified he did not know codefendants intended to shoot the victims. Defendant said he continued to follow codefendants' instructions as they chose their targets because he feared for his safety. Defendant, however, never attempted to withdraw himself from the scene or report the offenses.

¶ 7        Sherman Lee testified that he lived at 117th and Parnell in Chicago, Illinois. On the date in question, he was walking home when a dark car pulled up next to him with three people inside. The individual in the front passenger seat asked him if he had any "weed" and if he was a Gangster Disciple. When Lee responded "no" to both questions, the man in the front passenger seat pointed a handgun at Lee and shot Lee in the side. Lee ran away and the shooter fired at least two more shots in his direction. Lee later identified Smith as the shooter. Lee was unable to identify the other two men in the car.

¶ 8        Wayne Spears testified that, on the date in question, he returned to his home at 11731 South Lowe in Chicago, Illinois, and said hello to three people standing outside the front of the building. While inside his kitchen, Spears heard two gunshots fired outside. Spears ran to the front of the house to look out the window. Spears saw that one of the three individuals he had seen standing out front had been shot in the head and abdomen. Lamar Eckstine died as a result of the gunshot wounds.

¶ 9        Brian Treadwell testified that, on the same date in question, he was walking in an alley near 117th and Halsted Street in Chicago, Illinois, when a car pulled up carrying three individuals. The man in the rear seat behind the driver asked Treadwell whether he had any "weed." When Treadwell did not respond, the man asked again. Treadwell started to turn to run away when the man in the rear seat revealed a handgun and shot at Treadwell. The bullet hit Treadwell in the abdomen. Treadwell ran away and heard eight or nine additional gunshots as he ran. Treadwell identified Washington as the shooter. Treadwell was unable to identify the other two individuals in the car.

¶ 10       Codefendant Washington, who pled guilty to his involvement in the offenses and was sentenced to 26 years' imprisonment, testified that he was in a car around midnight on the date in question looking to avenge a fellow gang member's death. Washington did not know the driver of the car except that he was a fellow member of the Black Disciples gang. Washington was armed and sat in the rear seat behind the driver. He shot three people in different locations within minutes. Washington said he shot all the victims, but he did not instruct the driver to slow the car in order to do so. The police eventually arrived and chased the car. Washington testified that he and the driver exited the car and attempted to flee. Washington was caught and arrested.

¶ 11       When interviewed by the police, Washington originally named two rival gang members as being with him when he shot the individuals. Washington, however, eventually implicated defendant and codefendant Smith. Washington retracted his identifications of defendant and Smith at trial, explaining that the police forced him to name defendant and Smith because of their criminal backgrounds.

¶ 12       After being interviewed by the police, Washington agreed to videotape his statement. At trial, he testified that most of the videotaped statement was untrue. The videotape was published to the jury.

¶ 13       In the videotape, Washington said he, defendant, and Smith were selected by their gang to shoot rival gang members in exchange for drugs and money. Defendant drove the car, Smith sat in the front passenger seat, and Washington sat in the backseat. Defendant and Smith were armed with handguns and all three shot at different individuals throughout the

neighborhood: Smith shot at an individual near 117th and Lowe, and defendant shot at a second individual near that location; Washington shot at an individual in an alley, and Smith fired shots at the same individual; and Smith shot at an individual near 118th and Wallace. On the videotape, Washington said he was treated well by the police. At trial, however, Washington testified he was "jacked" by the police.

¶ 14    Detective John Otto testified that he and Assistant State's Attorney (ASA) William Merritt interviewed defendant on January 30, 2004. Otto advised defendant of his *Miranda* rights, which defendant waived. Defendant admitted that he drove the vehicle involved in the shootings while Smith and Washington rode as passengers. When Otto confronted defendant with inconsistencies between his confession and Washington's statement, defendant drew a diagram of the shootings as he remembered them. Defendant said he drove the vehicle during each shooting. Defendant never told Otto that he was threatened at gunpoint to drive the vehicle.

¶ 15    ASA Merritt's testimony was consistent with that of Detective Otto, adding that defendant said he was the driver, but not a shooter.

¶ 16    Defendant consented to have his confession videotaped. The videotape was admitted as evidence. The videotaped statement was consistent with defendant's confession, adding that he was in shock after the first shooting, but he continued driving as told. Defendant did not say he was threatened at gunpoint.

¶ 17    At trial, defendant testified that he did not know Washington and Smith were armed when he agreed to drive them to obtain marijuana. While driving, Washington first instructed defendant to slow down near two men standing on a corner. Washington rolled down the window, asked the men for marijuana, and then shot at them. Defendant was shocked, but he was instructed to drive away. He complied. On the way to the next location, near 119th and Wallace, Washington and Smith told defendant to slow the car when they saw another individual. Smith asked that individual whether he had marijuana and whether he was a rival gang member. The individual responded in the negative to both questions. Smith shot him in response. Defendant then drove to the next location, toward Union Avenue, as instructed. He was told to stop when they reached a man in an alley. Washington asked the man about marijuana and then shot him.

¶ 18    On cross-examination, defendant said he did not want to continue driving the car, but he was ordered to at gunpoint. Defendant admitted he did not include that fact in his videotaped statement; however, after first saying he never told the detectives because they never asked, defendant maintained that he reported the fact to the detectives before he gave the videotaped statement. Defendant testified that he drove to the second location as instructed because he thought he would be shot if he disagreed. Defendant said he stopped the car during the second shooting, but did not attempt to exit or flee because he was afraid. Defendant denied knowing Washington and Smith intended to shoot the man in the alley, but admitted he drove the car around the block to find the man again. When unsuccessful, Smith and Washington exited the car and approached a different individual. Defendant was instructed to wait in the car, and he complied. Smith and Washington shot that individual, then told defendant to drive away. Defendant tried to slow the car when the police approached, but was instructed

-4-

to turn on a dead-end road and to speed up. He complied and did not exit the car to run away until instructed. Defendant later moved to Du Page County. Defendant denied evading the police, but admitted he never reported the offenses because he feared for his and his family's safety.

¶ 19    The jury found defendant not guilty of aggravated battery with a firearm of the first victim (Lee), but guilty of aggravated battery with a firearm of the second victim (Treadwell) and first degree murder of the third victim (Eckstine). Both convictions were based on the theory of accountability. Defendant was sentenced to consecutive sentences of 35 years' imprisonment for the first degree murder count and 10 years' imprisonment for the aggravated battery with a firearm count. This appeal followed.

¶ 20                              DECISION
¶ 21                              I. Rule 431(b)
¶ 22    We first turn to the issue of whether the court complied with the requirements of Rule 431(b) in conducting *voir dire* and, if not, whether lack of compliance constitutes reversible error.

¶ 23    Defendant concedes that he did not raise a Rule 431(b) objection. See *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988) (in order to preserve an error for appellate review, the defendant must object at trial and include the alleged error in a posttrial motion). The plain error doctrine allows us to review an issue affecting substantial rights despite forfeiture in either of two circumstances:

> "First, where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence, a reviewing court may consider a forfeited error in order to preclude an argument that an innocent man was wrongly convicted. [Citation.] Second, where the error is so serious that defendant was denied a substantial right, and thus a fair trial, a reviewing court may consider a forfeited error in order to preserve the integrity of the judicial process." *People v. Herron*, 215 Ill. 2d 167, 178-79, 830 N.E.2d 467 (2005).

The burden is on the defendant to establish plain error. *Thompson*, 238 Ill. 2d at 613.

¶ 24    Defendant recognizes that the *Thompson* case invalidated his former argument under the second prong of plain error. *Id*. at 613-14 (in order to establish second-prong plain error, a defendant must establish the error was structural, *i.e.*, that the jury was biased). Defendant, however, contends he is entitled to a new trial under the first prong of plain error because the evidence supporting the jury's guilty verdict was closely balanced.

¶ 25    Before determining whether there was first-prong plain error, we first must determine whether any error occurred. *People v. Hudson*, 228 Ill. 2d 181, 191, 886 N.E.2d 964 (2008). We review the construction of a supreme court rule *de novo*. *Robidoux v. Oliphant*, 201 Ill. 2d 324, 332, 775 N.E.2d 987 (2002).

¶ 26    Supreme Court Rule 431(b) codified our supreme court's holding in *People v. Zehr*, 103 Ill. 2d 472, 477, 469 N.E.2d 1062 (1984). As amended, Rule 431(b) places a *sua sponte* duty on trial courts to ensure compliance with its mandates. *Thompson*, 238 Ill. 2d at 607. The

amended rule provides:

"(b) The court *shall ask* each potential juror, individually or in a group whether that juror *understands and accepts* the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.

The court's method of inquiry *shall provide* each juror an *opportunity to respond* to specific questions concerning the principles set out in this section." (Emphasis added.) Ill. S. Ct. R. 431(b).

¶ 27   The court conducted *voir dire* and empaneled the jury. Prior to beginning *voir dire*, the trial court made the following introductory comment:

"The charges in this case, ladies and gentlemen, come by way of a Cook County Grand Jury indictment. They are not any evidence of guilt against [defendant]. He is presumed innocent of the charges and the State has the burden of proving him guilty beyond a reasonable doubt."

¶ 28   The first panel of prospective jurors was then brought forward. The judge said:

"As I indicated earlier, the defendant is presumed innocent of the charges. The State has the burden of proving the defendant guilty beyond a reasonable doubt. The defendant is not required to prove his innocence, nor is he required to testify or call witnesses on his own behalf.

Should the State meet their burden of proof beyond a reasonable doubt, is there anybody seated in the jury box who could not or would not go into the jury room with your fellow jurors and the law that governs this case as I give it to you and sign a verdict form of guilty? Anybody who could not or would not do that for any reason?

(No audible response.)

No response. Should the State fail to meet their burden of proof beyond a reasonable doubt, is there anybody seated in the jury box who could not or would not go into the jury room with your fellow jurors and the law that governs this case as I give it to you and sign a verdict form of not guilty?

(No audible response.)

No response."

Eight jury members were selected from this panel. After the eight jury members were selected, they were sent to the jury room and were not present for the *voir dire* of the remaining panels.

¶ 29   When the second panel of potential jurors was brought forward, the judge said:

"Ladies and gentlemen, I wish to thank you for your time and patience. As I indicated earlier, the charges against the defendant come by way of a Grand Jury indictment. They are not any evidence against the defendant.

The defendant is presumed innocent of the charges against him and the State has the burden of proving him guilty beyond a reasonable doubt. He is not required to call witnesses on his own behalf or testify on his own behalf.

Is there anybody who has any qualms or problems with those propositions of law?

(No audible response.)

No response. Should the State meet their burden of proof beyond a reasonable doubt, is there anybody seated in the jury box who could not or would not go into the jury room with your fellow jurors and follow the law that governs this case as I give it to you and sign a verdict form of guilty? Anybody who could not or would not do that for any reason?

(No audible response.)

No response. Should the State fail to meet their burden of proof beyond a reasonable doubt, is there anybody seated in the jury box who could not or would not go into the jury room with your fellow jurors and the law that governs this case as I give it to you and sign the verdict form of not guilty?

(No audible response.)

No response."

Four jurors were selected to serve from this panel and one juror was selected as an alternate.

¶ 30    When the court called the third panel, the judge said:

"Again, ladies and gentlemen, I wish to thank you for your time and patience. As indicated in my opening remarks, the defendant is presumed innocent of the charges against him and the State has the burden of proving him guilty beyond a reasonable doubt.

Is there anyone who has any problems or qualms with that proposition of law?

(No audible response.)

No response. The defendant is not required to prove his innocence. He is not required to call witnesses or testify on his own behalf.

If the State meets their burden of proof beyond a reasonable doubt, is there anybody seated in the jury box who could not or would not go into the jury room with your fellow jurors and the law that governs this case as I give it to you and sign a verdict form of guilty? Anybody who would not or could not do that?

(No audible response.)

No response. If the State should fail to meet their burden of proof beyond a reasonable doubt, is there anybody who could not or would not follow the law and sign a verdict form of not guilty.

(No audible response.)

No response."

One alternate juror was selected from this panel.

¶ 31    The incomplete *voir dire* conducted in this case is the practice the amended rule seeks

to end. Ill. S. Ct. R. 431, Committee Comments (a court may not simply make "a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law"); accord *Thompson*, 238 Ill. 2d at 607. With regard to the first panel of prospective jurors, from which eight were empaneled, the court provided only three of the four *Zehr* principles in narrative form, not in questions. Asking the first panel as a group whether they would sign the appropriate verdict form if the State had or had not met its burden of proof was not in compliance with Rule 431(b). The court did not adequately determine whether the majority of empaneled jurors understood and accepted *any* of the four *Zehr* principles. In *Thompson*, the supreme court advised:

> "Rule 431(b), therefore, mandates a specific question and response process. The trial court must ask each potential juror whether he or she *understands and accepts each* of the principles in the rule. The questioning may be performed either individually or in a group, but the rule *requires an opportunity for a response from each prospective juror on his or her understanding and acceptance* of those principles." (Emphasis added.) *Thompson*, 238 Ill. 2d at 607.

The court's inquiry failed to comply with the dictates of Rule 431(b) and, therefore, constitutes error.

¶ 32    In light of our finding, we must determine whether the error was reversible as first-prong plain error. To establish first-prong plain error, a defendant must demonstrate " 'prejudicial error.' That is, the defendant must show both that there was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Herron*, 215 Ill. 2d at 187. A defendant is guilty of an offense under the theory of accountability where, "[e]ither before or during the commission of the offense, and with the intent to promote or facilitate such commission," he aids, abets, or agrees in the planning or commission of the offense. 720 ILCS 5/5–2(c) (West 2002).

¶ 33    The evidence demonstrated defendant was accountable for the shooting death of Eckstine and the aggravated battery with a firearm of Treadwell. Defendant agreed to drive codefendants while they completed their shooting spree. The jury did not find defendant accountable for the first shooting of Lee despite the fact that a defendant may be held accountable for an offense even where he was unaware that his codefendant possessed a weapon. See *People v. Garrett*, 401 Ill. App. 3d 238, 245, 928 N.E.2d 431 (2010). Defendant, however, was found accountable for the subsequent two shootings in which defendant continued to drive the car after learning Washington and Smith were armed and were not merely looking to purchase marijuana. The events that transpired were overwhelmingly supported by defendant's confession, defendant's videotaped statement, Washington's confession, Washington's videotaped statement, and the trial testimony of defendant, Lee, Spears, and Treadwell.

¶ 34    We recognize that the reported order of the shootings differs between the accounts of defendant and Washington, that Washington recanted his prior statements identifying defendant as the driver, and that there was no physical evidence tying defendant to the shootings; however, it was the jury's duty to make credibility determinations, weigh the witness testimony, and draw reasonable inferences from the evidence. *People v. Evans*, 209

Ill. 2d 194, 211, 808 N.E.2d 939 (2004). The jury exercised its judgment and our review of the record supports the jury's finding. We conclude that the evidence against defendant was substantial.

¶ 35    Because we have found that the evidence was overwhelming and not closely balanced, the trial court's Rule 431(b) error does not constitute plain error.

¶ 36                                II. Ineffective Assistance of Counsel

¶ 37    Defendant contends his counsel was ineffective for failing to present a viable defense. In particular, defendant argues that his counsel improvidently advanced a compulsion defense at trial even though compulsion is a prohibited defense in first degree murder cases, effectively leaving defendant without a defense.

¶ 38    To demonstrate ineffective assistance of counsel, a defendant must show counsel's performance was deficient and such deficient performance caused substantial prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Failure to establish either prong of the test precludes a finding of ineffective assistance of counsel. *Id.* at 697. However, if a defendant cannot establish prejudice, the reviewing court need not determine whether the counsel's performance fell below the objective standard of reasonableness. *Id.*

¶ 39    "Generally, counsel's choice of an appropriate defense is a matter of trial strategy or tactics not reviewable under the *Strickland* test, unless that choice is based upon a misapprehension of the law. [Citations.] Misapprehension of a defense theory may be shown where evidence is presented in such a manner that the jury is left with no choice but to convict defendant of the offenses charged [citation] ***." *People v. Garmon*, 394 Ill. App. 3d 977, 987, 916 N.E.2d 1191 (2009).

¶ 40    Here, defense counsel's request for a jury instruction regarding the defense of compulsion was denied because the law provides that compulsion is a prohibited defense in first degree murder cases. *People v. Gleckler*, 82 Ill. 2d 145, 157, 411 N.E.2d 845 (1980); *People v. Haynie*, 347 Ill. App. 3d 650, 655, 807 N.E.2d 987 (2004); see 720 ILCS 5/7–11 (West 2002).

¶ 41    Notwithstanding, at the jury instruction conference, defense counsel argued that the compulsion defense should be available because defendant was charged under the accountability statute as opposed to solely under the murder statute. Noting that, based on the evidence, it would be a "stretch" to include such an instruction, the trial court denied defense counsel's request. During deliberations, the jury sent a note to the court asking, "Suppose the defendant was threatened and forced to drive the car, is he guilty solely because he didn't report the crime to the police?" By the agreement of the parties, the jury was instructed that it had heard all of the evidence and the law and should continue deliberating. As previously stated, the jury returned a split verdict, finding defendant not guilty of the aggravated battery with a firearm of Lee but guilty of the aggravated battery with a firearm of Treadwell and Eckstine's murder. The split verdict demonstrates that the jury was not forced to find defendant guilty as a result of defense counsel's "misapprehension of the law"

where he argued that defendant was compelled to drive the shooters.

¶ 42    The instant case is distinguishable from *People v. Chandler*, 129 Ill. 2d 233, 543 N.E.2d 1290 (1989), a case heavily relied upon by defendant. In *Chandler*, our supreme court concluded the defendant was denied effective assistance of counsel where his attorney failed to cross-examine key prosecution witnesses, poorly cross-examined other State witnesses, failed to call defense witnesses despite his promise during opening statements that the defendant would testify and explain his involvement in the murder on trial, and conceded in closing that his client had entered the victim's house. *Id.* at 248-49. The defense counsel erroneously believed the defendant could not be found guilty of murder if he did not fatally wound the victim despite the fact that the defendant had been charged under the accountability and felony murder statutes. *Id.* at 247. As a result, the supreme court held that, because of his misapprehension of the law, the defense counsel's strategy and actions amounted to no real defense and failed to subject the State's case to meaningful adversarial testing. *Id.* at 249.

¶ 43    In comparison, here, defense counsel was faced with an uphill battle where defendant confessed to driving the shooters in his police statement, videotaped statement, and at trial. Defendant's confessions were further supported by Washington's police statement and videotaped statement. Nevertheless, defense counsel cross-examined the State's witnesses demonstrating that neither of the victims or Spears identified defendant, and presented defendant's trial testimony in which he maintained he only agreed to drive Washington and Smith to purchase marijuana and then continued driving them after the first shooting only because he was forced to at gunpoint and feared for his safety. Defense counsel did subject the State's case to meaningful adversarial testing. Defendant has not demonstrated counsel's performance was deficient.

¶ 44    We conclude that, even assuming, *arguendo*, defense counsel should not have argued defendant was compelled to drive his codefendants when Eckstine was shot and killed, defendant has failed to present a reasonable probability that, but for defense counsel's error, the outcome of his trial would have been different. Consequently, defendant's ineffective assistance of counsel claim fails.

¶ 45                             III. Impeaching Testimony

¶ 46    Defendant contends the State improperly impeached codefendant Washington with the factual basis from his guilty plea, as presented by the State, because it was not expressly adopted by Washington.

¶ 47    Defendant concedes that he failed to preserve his contention for our review by not objecting at trial or including the alleged error in a posttrial motion. See *Enoch*, 122 Ill. 2d at 186. As previously stated, we may review a forfeited error under the doctrine of plain error when (1) the evidence was close, regardless of the seriousness of the error; or (2) the error was so serious as to deny a substantial right, and thus a fair trial, that the closeness of the evidence does not matter. *Herron*, 215 Ill. 2d at 178-79. Defendant requests that we consider the error under first-prong plain error. Again, we first must determine whether any error occurred. *Hudson*, 228 Ill. 2d at 191.

¶ 48    At issue is the State's impeachment of Washington with the factual basis from his guilty plea hearing. Specifically, the following exchange took place:

"THE STATE: When you pled guilty, you stood in front of [the] judge with your lawyer, correct?

MR. WASHINGTON: Correct.

\* \* \*

THE STATE: Well, at some point the judge asked for the prosecutor to read some facts into the record about what happened the night of these shootings. Remember that?

MR. WASHINGTON: Yes.

THE STATE: And that prosecutor \*\*\* read into the record that on the night of the shootings you were with James Anderson and Sheldon Smith in the [car], correct?

MR. WASHINGTON: Correct.

DEFENSE COUNSEL: Judge, I want to ask for a sidebar.

THE COURT: Overruled.

THE STATE: Correct?

MR. WASHINGTON: Correct.

THE STATE: And you never raised your hand and said, oh, no, that's not right, they weren't with me, did you?

MR. WASHINGTON: 'Cause–

THE STATE: Yes or no, sir, you never raised your hand?

MR. WASHINGTON: Hold on. Hear me out, though, 'cause–

THE STATE: Judge, I am going to ask you–

THE COURT: Listen to the question, sir.

MR. WASHINGTON: No."

¶ 49    Relying on *People v. Henderson*, 95 Ill. App. 3d 291, 419 N.E.2d 1262 (1981), defendant contends that the factual basis of a codefendant's confession or admission, which implicates the defendant, cannot be used for impeachment where the codefendant did not affirmatively adopt the factual basis, but simply failed to correct the factual basis. *Id.* at 296. In *Henderson*, the codefendant, who previously pled guilty to the robbery offense, testified at the defendant's trial that the defendant was not the car passenger who fled the scene when the codefendant was arrested. *Id.* at 294-97. The State then impeached the codefendant with the fact that, when the State presented a factual basis of his guilt at his plea hearing, he did not disagree with the portion of the synopsis that indicated the defendant was the car passenger who fled the scene. *Id.* at 294-97. The court found the impeachment was prejudicial because it implied the codefendant had inculpated the defendant. *Id.* at 297.

¶ 50    Since *Henderson*, this court, in *People v. Mitchell*, 238 Ill. App. 3d 1055, 605 N.E.2d 1055 (1992), highlighted the fact that the impeachment in *Henderson* was prejudicial because it was the only testimony in a case entirely based on circumstantial evidence that implied the defendant was present when the arrest at issue occurred. *Mitchell*, 238 Ill. App. 3d at 1063.

The *Mitchell* court, however, concluded that an attempt to "skirt" the *Henderson* rule may be found harmless, especially where the evidence elicited from the erroneous impeachment is cumulative of other testimony. *Id.* at 1063-64.

¶ 51    We find that any erroneous impeachment here was harmless, especially in light of the overwhelming evidence that defendant was in fact the driver during the shootings. The impeachment was only one of several times that testimony provided defendant was the driver. Defendant himself admitted no less than three times through evidence presented at trial that he was the driver. Consequently, defendant cannot establish plain error.

¶ 52                         IV. Prosecutorial Misconduct

¶ 53    Defendant contends the State engaged in prosecutorial misconduct by offering personal commentary on the credibility of defendant and codefendant Washington, improperly asking defendant whether he thought Washington was truthful, and erroneously providing personal opinion regarding Washington's credibility during rebuttal argument.

¶ 54    Defendant yet again concedes that he failed to preserve his contention. See *Enoch*, 122 Ill. 2d at 186 (alleged errors that have not been objected to at trial and included in a posttrial motion are forfeited for purposes of review). Defendant asks that we consider the contention for first-prong plain error. See *Herron*, 215 Ill. 2d at 178-79. We first determine whether error occurred. *Hudson*, 228 Ill. 2d at 191.

¶ 55    Defendant first challenges the State's responses to testimony by defendant and Washington. In particular, after asking defendant whether he informed the detectives and the ASA that he was ordered by codefendants to drive at gunpoint and defendant responded that he told them everything, "my story never changed." The State responded, "I beg to differ," noting that defendant did not include that information in his videotaped statement. Then, again when defendant testified that he was told to drive at gunpoint, the State responded, "Really?" Later, while testifying regarding the shooting in the alley, defendant said his mind was focused on getting away from codefendants as soon as possible and the State responded, "Really. You hadn't even stopped the car to try to get away from them?" During Washington's testimony, the State twice responded, "Really?" when Washington testified that the detectives "jacked him up." Defendant argues that the State's responses were argumentative because they were not designed to elicit information, but rather expressed the State's personal opinion.

¶ 56    Defendant mistakenly relies on *People v. Clay*, 27 Ill. 2d 27 (1963), as support that the State's comments were improper. In *Clay*, the supreme court found the defense counsel's cross-examination was not unduly restricted when the trial court sustained an objection to the prosecution's rhetorical question demonstrating its disbelief of the witness's prior answer. *Id.* at 30. While it is improper for the State to inject personal opinion about the veracity of a witness because it is the jury's duty to assess credibility (*People v. Lee*, 229 Ill. App. 3d 254, 260, 593 N.E.2d 800 (1992)), we do not find the State's responses to inconsistencies in defendant's and Washington's testimony impermissibly influenced the jury's credibility assessment. Even assuming, *arguendo*, the State's comments were improper, the evidence supporting the jury's verdict was so substantial that defendant cannot

establish first-prong plain error.

¶ 57 Defendant next argues that the State improperly asked him whether he believed Washington lied on the stand. The challenged inquiry occurred during defendant's cross-examination. On direct, defendant testified that he was not a member of the Black Disciples and had no knowledge of the gang member's death for which revenge had been ordered. The following took place during cross-examination:

"THE STATE: There had been problems in the neighborhood between the Black Disciples and Gangster Disciples?

DEFENDANT: Not to my knowledge. I wouldn't know.

THE STATE: You don't know anything about that?

DEFENDANT: I wouldn't know.

THE STATE: So, when [Washington] in his video statement talks about the Black Disciples meeting where the Black Disciples want to retaliate for someone named Christopher Brooks or I think that was the last name, getting shot, and you being one of the people asked to do it, you are saying none of that is true?

DEFENDANT: None of that is true.

THE STATE: As you sit here today, you have no idea why [Washington] would say that about you or about Sheldon back in May of 2003 after he was arrested?

DEFENDANT: I have no idea."

¶ 58 Courts have consistently found it improper for a State to question a defendant regarding the veracity of a witness that testified against the defendant because such inquiry intrudes on the jury's function to assess the credibility of witnesses and serves to demean the defendant. *People v. Young*, 347 Ill. App. 3d 909, 926, 807 N.E.2d 1125 (2004). Such errors, however, have "generally been deemed harmless *** where evidence of defendant's guilt was overwhelming." *Id.*

¶ 59 We have repeatedly stated that the evidence here was overwhelming. Therefore, to the extent the State's cross-examination improperly infringed on the province of the jury by asking defendant whether and why Washington was untruthful in his videotaped statement, we find the error was harmless and defendant cannot establish first-prong plain error.

¶ 60 Defendant finally argues that the State erroneously offered its personal opinion regarding Washington's credibility during rebuttal argument. Specifically, in rebuttal, the State argued that Washington "lie[d] when he took *** [the] stand, and I'll get to that in a minute. And I agree with that, ladies and gentlemen. Murderer, yes. And guess who was hanging out with him on May 22, 2003, James Anderson."

¶ 61 In regard to closing arguments, this court has said:

"For a prosecutor's closing argument to be improper, he must 'explicitly state that he is asserting his personal views.' (Emphasis omitted.) [Citation.] Appellate courts are unwilling to infer that a prosecutor is injecting his personal opinion into an argument where the record does not unambiguously say so. [Citation.] Furthermore, a witness's credibility is the proper subject of closing argument if it is based on the evidence or reasonable inferences drawn from the evidence. [Citation.]" *People v. Jackson*, 391 Ill.

App. 3d 11, 43, 908 N.E.2d 72 (2009).

Moreover, a prosecutor may respond to comments made by the defense that clearly invite or provoke response. *People v. Hudson*, 157 Ill. 2d 401, 441, 626 N.E.2d 161 (1993).

¶ 62      Taking the challenged comments in context, we conclude the State's comment regarding Washington's credibility was based on the evidence and reasonable inferences drawn therefrom and that the State's comment regarding Washington being a murderer was in direct response to defense counsel's closing argument in which he repeatedly referred to Washington as a "sociopathic, perjurious, murderous witness." Notwithstanding, even assuming, *arguendo*, the rebuttal comments were improper, we have consistently concluded defendant cannot establish first-prong plain error where the evidence supporting the jury's verdict was overwhelming.

¶ 63                                    CONCLUSION

¶ 64      We conclude that, although the trial court failed to comply with the dictates of Rule 431(b), the error did not rise to the level of plain error. We further find defendant received effective assistance of counsel. We finally conclude that defendant cannot establish first-prong plain error to avoid forfeiture of his improper impeachment and prosecutorial misconduct contentions where the evidence against defendant was overwhelming.

¶ 65      Affirmed.