2020 IL App (1st) 171436-U

No. 1-17-1436

Order filed April 27, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 9120 |
| | ) | |
| MARTIN RUIZ, | ) | Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Griffin and Justice Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for first degree murder affirmed where his claims of prosecutorial misconduct are forfeited and not reviewable as plain error where no error occurred; case remanded to the trial court on the issues of correcting the sentencing credit and the fines and fees order.

¶ 2    Following a jury trial, defendant Martin Ruiz was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) for fatally shooting 15-year-old Jaime Ruvalcaba. The trial court sentenced defendant to 30 years' imprisonment for the murder and an additional 25-year

sentencing enhancement for personally discharging the firearm that caused Ruvalcaba's death for an aggregate sentence of 55 years' imprisonment. On appeal, defendant contends that he was deprived of his right to a fair trial because the prosecutor engaged in a pattern of pervasive prosecutorial misconduct. Defendant claims that the prosecutor introduced impermissible evidence suggesting that the shooting was gang-related and that defendant was a gang member, improperly shifted the burden of proof to defendant in her rebuttal argument, and impermissibly injected her personal opinion that defendant was guilty in her rebuttal argument. In addition, defendant contends, and the State agrees, that this case must be remanded to the trial court to address the issues of correcting the days of sentencing credit on the mittimus and vacating erroneously assessed fees from the fines and fees order. We remand this case to the trial court to address the issues of correcting the mittimus and the fines and fees order, and affirm defendant's conviction in all other respects.

¶ 3    Defendant was charged with six counts of first degree murder for shooting Ruvalcaba. Prior to trial, the State moved to admit proof of other crimes evidence, specifically, that minutes prior to shooting Ruvalcaba, defendant had approached another young man sitting in a vehicle and pointed a gun at his head. The State argued that the two crimes were intertwined, and that the evidence would show defendant's identity, intent, knowledge, state of mind, and the continuing narrative. The trial court granted the motion to admit the other crimes evidence.

¶ 4    Defendant filed a motion *in limine* asking the court to bar evidence at trial of "gang activity, neighborhood gang conflict and/or gang involvement by Mr. Ruiz." Defendant argued that there was no evidence that the shooting of Ruvalcaba was gang-related, and "[t]he introduction of any gang activity, neighborhood conflict and/or gang involvement by Mr. Ruiz" would be prejudicial.

At the hearing on the motion, the State replied that there would be no testimony regarding any gang activity "per se." However, police officers would testify that they identified defendant in a surveillance video based on their prior contact with him, they knew defendant by his name and his nickname "Garbage," and knew him as a self-admitted member of the La Raza gang. The trial court ruled as follows:

> "The motion is granted. The State will be prohibited and their witness [*sic*] will be instructed not to bring out any evidence that Mr. Ruiz is a member of any particular gang. At the same time, the State's witnesses, the police witnesses will be able to testify, presuming it's the truth, that they knew Mr. Ruiz from prior contacts as we will describe it, and not prior arrests, not prior gang activity, but prior contacts. They knew him. They knew his nickname, and they were able to – if that's what they claim, identify him from some surveillance video, and that's why they sought him in order to further their investigation."

¶ 5    The State proceeded to trial on two counts of first degree murder and nol-prossed the remaining four counts. At trial, Liset Reyes testified that she was Ruvalcaba's mother. About 3 p.m. on August 21, 2012, Ruvalcaba left his home in the 1900 block of West 47th Street to get a haircut. His 16th birthday was the following day. About 4 p.m. on August 21, Reyes heard gunshots. She called and texted Ruvalcaba, but he did not answer. A woman from the neighborhood told Reyes that her son was on the ground. Reyes ran across the street from her home and saw Ruvalcaba. He was injured, trying to breathe, and unable to speak. An ambulance transported Ruvalcaba to Stroger Hospital where he died.

¶ 6    Leticia Rios testified that about 4 p.m. on August 21, 2012, she was sitting in the driver's seat of her vehicle parked in a bank parking lot at 47th Street and Hermitage Avenue. Her vehicle was facing 47th Street. Her 15-year-old son, Alexis Rios, was in the vehicle with her. A gray car drove past their vehicle on 47th Street. The same gray car returned to the area and parked on Hermitage. Alexis told Leticia that when the car drove past them the first time, the occupants looked at them. Leticia told Alexis not to look at the gray car. Leticia looked in her rearview mirror and observed a man exit the gray car and watched him approach her vehicle. Leticia turned her head and saw the man standing next to her son's window. In court, Leticia identified defendant as that man.

¶ 7    Defendant held a gun to Alexis' head. Alexis closed his eyes. Leticia repeatedly yelled at defendant not to kill her son. She also yelled "God, help me." Leticia testified that she told defendant "[t]o leave him alone, that he was not a gang banger, just a lot of things that started coming to mind." Defendant lowered his gun, said something, and walked away. Leticia and Alexis exited their vehicle and ran inside the bank. Leticia asked the bank manager to watch her son. Leticia returned outside to see if defendant was still there and observed police and ambulances. Leticia learned that something had happened at 47th Street and Wolcott Avenue. She went to that area and told the police what happened to her and Alexis moments before. She told the officers that the gunman was Hispanic, wearing red and black clothing, and had a large black gun. On August 28, 2012, Leticia viewed a photo array and identified defendant as "[t]he one who put the gun on my son." On April 21, 2013, Leticia identified defendant in a lineup.

¶ 8    On cross-examination, Leticia testified that she had never before seen the gunman. She did not observe the license plate number on the gray car.

¶ 9    Alexis Rios testified substantially the same as Leticia that they were parked in the bank parking lot about 4 p.m. on August 21. Alexis confirmed that he was 15 years old on that date, and was sitting in the passenger's seat of their vehicle. Alexis observed a gray Chrysler drive past the front of their vehicle on 47th Street. He could only see the driver, whom he did not recognize. Shortly thereafter, Leticia told Alexis that a man was approaching their vehicle. Alexis looked to his right and observed defendant standing next to him, pointing a gun against Alexis' right temple. Defendant was wearing red shorts and a black shirt. Alexis identified defendant in court. The gun was large and black. Alexis closed his eyes and waited for the sound of a gunshot. Leticia yelled at defendant in Spanish, telling him not to kill Alexis and that he was not a gang banger. Defendant pointed the gun against Alexis' head for about four minutes. Defendant stated, "it was your lucky day, mother f***" and walked away towards Hermitage. Defendant entered the Chrysler and the vehicle drove down 47th Street towards Wolcott. Alexis could not see if there were other people inside the Chrysler. Alexis went inside the bank and waited for Leticia to return. About 15 to 20 minutes later, one of Leticia's friends came to the bank and took Alexis to 47th Street and Wolcott, where another man had been shot. Alexis told the police what happened to him moments before. Alexis described the gunman as Hispanic, in his 20s, five feet nine inches tall, 220 pounds, and wearing a black t-shirt and red shorts. On September 6, 2012, Alexis viewed a photo array and identified defendant as the man who held a gun against his head on 47th Street.

¶ 10    On cross-examination, Alexis acknowledged that he kept his eyes closed while the gun was against his head and did not open them until the gunman was walking to the Chrysler with his back to Alexis. Alexis did not know defendant and had never seen the gunman before the day of the

incident. On redirect examination, Alexis confirmed that defendant was the man who pointed the gun against his temple, and the same man he identified in the photo array.

¶ 11    Dafniy Ramirez testified that about 4 p.m. on August 21, 2012, she was standing outside the front of her house on 47th Street near Winchester Avenue with her boyfriend, Fernando Blanco. Dafniy observed a Chrysler stop in front of a clinic at the corner of 47th Street and Wolcott. A man exited the rear passenger's side of the Chrysler with a gun in his hand. Dafniy observed the gunman fire several shots at another man. Nothing obstructed her view of the shooting; however, she was too far to see the gunman's face. The gunman reentered the rear passenger's side of the Chrysler, which drove past her and Blanco on 47th Street. Blanco memorized the Chrysler's license plate number, then recited it to Dafniy as she wrote it on the wall of her house. When the police arrived at the scene, Dafniy told them what she saw and showed them where she had written the license plate number. On cross-examination, Dafniy acknowledged that she never identified the shooter.

¶ 12    Fernando Blanco testified that at the time in question he and Dafniy were standing in front of her house on 47th Street between Winchester and Wolcott Avenues, next to a candy store. Blanco heard four or five gunshots coming from Wolcott. Blanco looked in the direction of the gunfire and observed a young man with a gun in his right hand entering the passenger's side of a gray Chrysler 300 that was parked in front of a clinic. Blanco was about half a block away from the Chrysler and nothing obstructed his view of the gunman. Blanco saw the gunman's face and recognized him. In court, Blanco identified defendant as the gunman. The Chrysler drove past Blanco and Dafniy as it left the scene. There were two occupants in the vehicle, the driver and defendant. Blanco memorized the license plate number and typed it into his cell phone. He gave

the license plate number to Ruvalcaba's uncle. Blanco did not recall if he gave the number to Dafniy. Blanco went to the location of the shooting, saw Ruvalcaba lying on the ground, and observed gunshots on his stomach. Blanco noted that he wrote down one wrong number for the license plate. The following day, Blanco viewed a lineup at the police station, but did not identify anyone as the shooter. Defendant was not in that lineup. On April 21, 2013, Blanco viewed another lineup and identified defendant as the shooter.

¶ 13    Cristal Zarajoza testified that at the time in question she was working near 47th Street and Wolcott when she heard multiple gunshots. She ran outside onto 47th Street to look for her nephew. Zarajoza saw a group of people at the corner and ran there. She observed a young man whom she did not know lying on the ground bleeding. Zarajoza had left her vehicle parked on Wolcott the previous day. After the shooting, Zarajoza observed a gunshot in the rear of her vehicle that was not there the previous day. On cross-examination, Zarajoza acknowledged that she did not know when her vehicle was struck by a bullet.

¶ 14    Joseph Ramirez testified that at 4 p.m. on August 21 he was leaving a candy store on 47th Street with his five-year-old daughter. As they crossed an alley between Wolcott and Winchester, Joseph noticed a grayish Chrysler 300 with a special grill. As Joseph walked past the Chrysler, the driver slouched back in his seat as if he were hiding from something. Joseph crossed Wolcott, and when he was no more than 100 feet from the corner, he heard between four and eight gunshots. Joseph pick up his daughter and held her against a wall. When the shooting stopped, Joseph looked back and observed a man turning the corner with a gun in his hand, running towards the Chrysler. In court, Joseph identified defendant as the gunman. Joseph also observed a young man who appeared to be shot, trying to walk and stumbling. The victim fell to the ground, and Joseph saw

a large amount of blood. He called 911. Joseph took his daughter home then ran back to the scene to see if he could help. The following afternoon, Joseph viewed a photo array and identified defendant as the shooter. On April 21, 2013, Joseph identified defendant in a lineup. On cross-examination, Joseph acknowledged that he never observed defendant shooting the gun, nor did he observe any gunshots.

¶ 15    Kim Barrett testified that about 4:05 p.m. on August 21 she was working as a physician's assistant at the Children's Medical Center located at the corner of 47th Street and Wolcott. Barrett thought she heard four or five gunshots outside. She went to the front desk near the 47th Street entrance and saw her coworker, Lupe, looking out a window onto Wolcott. Barrett looked out the window and saw someone lying on the ground. Barrett told Lupe to call 911. Barrett went outside, approached the young man lying on his back, and assessed his wounds. He was gasping for air and bleeding heavily from his right arm and abdomen. Barrett applied pressure to his wounds. Another man who identified himself as an EMT assisted Barrett. The police and an ambulance arrived at the scene, and the victim was placed inside the ambulance. Barrett did not witness the shooting, observe anyone with a gun, or observe a vehicle fleeing the area. The clinic had a surveillance video camera that recorded the front entrance at 47th Street and Wolcott. Barrett brought two detectives inside the clinic and viewed the surveillance video with them. The video was published to the jury.

¶ 16    Chicago Fire Department paramedic Barbara Kaspar testified that when she and her partner, Brendon Hehir, arrived at the scene, Ruvalcaba was laying on the ground with multiple gunshot wounds, bleeding, unresponsive, and had very shallow and slow breathing. They placed Ruvalcaba inside the ambulance and counted eight gunshot wounds – three to the abdomen and

one each to the left arm, left armpit, right arm, right armpit, and groin. While en route to Stroger Hospital, Ruvalcaba stopped breathing, did not have a pulse, and flat-lined.

¶ 17    Chicago police officer Angel Cahue testified that on August 21, he was assigned to the "Gang Enforcement Unit" covering four districts on the southwest side of the city. About 4:05 p.m., Cahue and his partner, Officer Romero Gonzalez, responded to a call of a person shot at 47th Street and Wolcott. When they arrived at the scene, the victim had already been transported to the hospital. They learned that they were looking for a light-colored Chrysler 300 with license plate number L349350. Cahue entered the license plate number in the computer inside his vehicle and found that the Chrysler was registered to Jose and Ignacio Martinez at an address on South Ada Street. Cahue and Gonzalez searched the area and found the Chrysler parked on 49th Place near Hoyne Avenue, approximately four blocks from the shooting. The vehicle was not occupied. The police established surveillance of the Chrysler. At 7:48 p.m. police observed a minivan park behind the Chrysler. Jose Martinez exited the minivan and entered the Chrysler. The Chrysler and the minivan began driving away and the police stopped both vehicles. Martinez and the two occupants inside the minivan, Andy Ojeda and Sergio Barron, were taken into custody and transported to the police station for further investigation regarding the shooting. The Chrysler was towed and impounded for investigation. On cross-examination, Cahue testified that his computer did not indicate that the Chrysler had been stolen.

¶ 18    Chicago police officer Kenneth Hiatt testified that at 4:06 p.m. on August 21, he and his partner, Officer Kukielka[1], responded to a person shot at 47th Street and Wolcott. At the scene, Hiatt observed a Hispanic man lying on the ground who had been shot and several shell casings

---

[1] Officer Kukielka's first name does not appear in the record.

laying around him. Paramedics arrived and transported the victim to Stroger Hospital. Hiatt entered the clinic at the scene and viewed a surveillance video. On the video, Hiatt observed a four-door sedan pull up just west of the intersection of 47th Street and Wolcott. A heavy-set Hispanic man wearing a black t-shirt and red shorts exited that vehicle. The man was holding a black handgun in his hand. The man ran towards the corner on 47th Street and turned at the corner. The man ran back to the vehicle with the gun in his hand and entered the vehicle, which drove away heading west on 47th Street. Hiatt told Kukielka, some detectives, and "the gang team members" who were present what he observed on the video. On cross-examination, Hiatt acknowledged that he did not observe the shooting on the video.

¶ 19    Chicago police sergeant Marvin Otten testified that he was a forensic investigator and arrived to process the crime scene at 6:15 p.m. Otten collected three fired cartridge cases, a swab of suspect blood, and a fired bullet from the trunk of a vehicle.

¶ 20    Chicago police officer Rodrigo Corona testified that he had worked in the ninth district for 10 years. When he arrived at work on August 21, he was shown a photograph taken from a video of a possible suspect in a shooting that occurred that day at 47th Street and Wolcott. Corona immediately recognized the suspect as a man he knew from the neighborhood known by the name "Garbage." In court, Corona identified defendant as "Garbage." When asked what neighborhood he was referring to, Corona replied "I'm referring to the Back of the Yards, it's known as the La Raza neighborhood." Corona confirmed that area was part of the ninth district. Corona had seen defendant in the ninth district the day before the shooting and briefly spoke with him. After the shooting, he no longer saw defendant in the neighborhood.

¶ 21    Retired Chicago police officer Robert Vella testified that in his 25 years on the force, he worked in the regular patrol division, the tactical unit, and his "last assignment was gang investigations." August 21 was the first day he was with "the 6565 team, gang investigations." Prior to that day, he had worked in the ninth district for 17 years. Shortly after 4 p.m., he was assigned to assist the detectives in the ninth district with a homicide. Vella and his partner, Officer Perez,[2] patrolled the neighborhood looking for the suspect. A few hours later, Vella was directed to 49th Street and Hoyne where the vehicle involved in the homicide had been located. Upon arriving at 49th Street, Detective Roberto Garcia showed Vella a photograph of a man wearing a black t-shirt and red shorts. Vella recognized the man in the photograph as "Martin Ruiz," who was also known as "Garbage." Vella had met defendant numerous times while working in the ninth district. Vella identified defendant in court. After recognizing defendant, Vella entered defendant's name in the computer inside his vehicle. Defendant's photograph appeared on Vella's computer, which he then showed to Garcia. Vella knew where defendant lived. Vella and his team patrolled the area around defendant's house and set up surveillance for several days but were unable to locate defendant.

¶ 22    Karen Melone, a customer service manager with Southwest Airlines, testified that at 2:54 p.m. on August 22, 2012, a one-way ticket to Los Angeles on flight number 360 was purchased in the name of Martin Ruiz with a date of birth of August 27, 1988. The flight was scheduled to depart Chicago at 8:30 p.m. that night and arrive in Los Angeles at 10:50 p.m. Defendant checked in at 6:32 p.m. and boarded the aircraft at 8:27 p.m.

---

[2] Officer Perez's first name does not appear in the record.

¶ 23    The State presented a stipulation that Dr. Ariel Goldschmidt, formerly an assistant medical examiner, would testify that he performed the autopsy on Ruvalcaba. Goldschmidt recovered two medium-caliber copper jacketed bullets from Ruvalcaba's body. Ruvalcaba suffered numerous gunshot wounds which injured both of his lungs, his liver, and the right and left atriums of his heart. Goldschmidt opined that the cause of death was multiple gunshot wounds, and the manner of death was homicide.

¶ 24    The State presented another stipulation that Chicago police forensic investigator David Ryan would testify that on August 22, 2012, he recovered 11 fingerprint ridge impressions from the interior and exterior of the Chrysler. Ryan also collected swabs from various locations inside the Chrysler for possible cellular material, and recovered a red and black baseball cap from the rear seat. The State offered a stipulation that forensic scientist Angela Kaeshamer conducted DNA analysis on the swabs collected from the Chrysler and the baseball cap, and found that they contained a mixture of profiles from multiple people. A major DNA profile from the cap did not match defendant.

¶ 25    Tracy Konior, a forensic scientist specializing in firearms identification, testified that she analyzed the two bullets recovered from Ruvalcaba's body and determined that they were both nine-millimeter and were fired from same firearm. Konior also analyzed a bullet recovered from a truck, which was inconclusive. In addition, Konior analyzed the three fired cartridge cases recovered from scene and found that they were all nine-millimeter and fired from same firearm.

¶ 26    Sheila Daugherty, a forensic scientist specializing in fingerprint analysis, testified that she examined the 11 latent fingerprint lifts recovered from the Chrysler and concluded that all 11 prints belonged to defendant. On cross-examination, Daugherty acknowledged that she did not know

when those prints were left on the vehicle, or how long the prints had been on the vehicle. Some of the lifts Daugherty received contained multiple prints that belonged to other people.

¶ 27    Chicago police homicide detective Gregory Jones testified that after interviewing the witnesses at the scene of the shooting, he learned that he was looking for a heavyset Hispanic man wearing a black t-shirt and red shorts who had exited and reentered a silver four-door Chrysler 300 that fled westbound on 47th Street from Wolcott. He also learned that a surveillance camera at the children's health clinic had captured part of the incident on video. In addition, Jones learned of the incident that occurred with Leticia and Alexis Rios three blocks east of the murder, and that the man who threatened to kill Alexis matched the description of the homicide offender. Jones was given a license plate number for the Chrysler which he shared with assisting officers who searched for the vehicle. Jones viewed the surveillance video from the clinic which showed the offender's vehicle arrive and park at the scene. The offender exited the front passenger seat of that vehicle with a gun in his hand. The offender was wearing a dark-colored short-sleeve t-shirt and red shorts. Still photos of the offender were made from the video. As the video was played for the jury a second time in court, Jones narrated what was occurring.

¶ 28    About 7 p.m., Jones heard "a radio transmission from the gang enforcement unit" that the vehicle had been located on 49th Place, about six blocks from the shooting, and was under surveillance. Jones and his partner, Garcia, went to 49th Place. A van occupied by Martinez, Ojeda and Barron arrived at that location and one of those men entered the Chrysler. The three men were taken into custody. Later that night, Dafniy Ramirez and Fernando Blanco viewed lineups containing Martinez, Ojeda and Barron, but could not identify any of the men. The three men were subsequently released from custody.

¶ 29    At the surveillance scene, Jones showed a still photo from the surveillance video to Vella. Vella recognized the man in the photo as someone he had previous contact with and knew his name was Martin Ruiz and his nickname was "Garbage." Jones notified assisting units of defendant's name and the search for defendant began.

¶ 30    On the afternoon of August 22, Joseph Ramirez viewed a photo array and identified defendant as the man he saw returning to the silver vehicle after hearing gunshots and seeing the victim fall to the ground. Jones identified defendant in court. On August 28, Leticia Rios viewed a photo array and identified defendant as the man who approached her vehicle, pointed a gun to her son's head and threatened to kill him. On September 6, Alexis Rios viewed a photo array and identified defendant as the man who put a gun to his head and threatened to kill him.

¶ 31    An investigative alert and arrest warrant were issued for defendant. Jones also requested assistance from the FBI to obtain a federal arrest warrant and locate defendant. On April 5, 2013, the FBI notified Jones that defendant had been taken into custody in Crenshaw, California. Jones and Garcia flew to Los Angeles, and on April 20, returned to Chicago with defendant. On April 21, Leticia, Blanco, and Joseph identified defendant in lineups. Dafniy viewed the lineup but was unable to make an identification.

¶ 32    In closing argument, the prosecutor argued that the evidence showed defendant intended to kill or cause great bodily harm to Ruvalcaba where he shot Ruvalcaba eight times – three times in the abdomen, twice in each arm, and once in the groin. The prosecutor noted that the offense also required that the evidence show that defendant performed the acts which caused Ruvalcaba's death. The prosecutor asked "[h]ow do we know that it was the defendant?" The prosecutor reviewed the testimony of each eyewitness in detail, noted that the witnesses identified defendant,

and that Officers Corona and Vella immediately recognized defendant in the photograph taken from the surveillance video. The prosecutor pointed out that 11 of defendant's fingerprints were recovered from the Chrysler, and that defendant fled to Los Angeles the day after the murder. In addition, the prosecutor noted that the State had to prove that defendant personally discharged a firearm that proximately caused Ruvalcaba's death. The prosecutor asked "[h]ow do we know this?" and again referred to the eyewitness testimony.

¶ 33    In response, defense counsel argued that this was a case of mistaken identification by the witnesses. Counsel asked, "how do we know that they're wrong?" and then reviewed their testimony in detail. Counsel argued that the testimony and identifications by the witnesses was unreliable. Counsel further argued that the video was unreliable because it was only 11 seconds long, grainy with shadows, and everything happened quickly. Counsel pointed out that the fingerprint expert testified that she did not know when or how defendant's prints were placed on the vehicle or how long they had been there. Counsel noted that police found the owner of the car and argued "no one came in here and testified that, oh, yeah, that's my friend and I know that he's familiar with these people or that he was in this car. Nobody came in here and said anything like that." Counsel concluded by arguing that defendant did not have to prove himself innocent, that it was the State's burden alone to prove him guilty beyond a reasonable doubt, and that the evidence was insufficient to establish his guilt.

¶ 34    In rebuttal, the prosecutor argued that there was no mistaken identity, that all the witnesses and police officers were not wrong, and that defendant was a cold-blooded murderer. The prosecutor argued that the video was not grainy and that it corroborated the testimony from all the witnesses. The prosecutor again reviewed the testimony from each eyewitness and argued that

their identifications of defendant were reliable. Regarding the fingerprint testimony, the prosecutor argued:

> "11 matches. Coincidence? Mistaken? They could have been left any other time? You didn't hear any testimony of any other date other than August 21st of 2012. By August 21st of 2012 at 7:00 p.m., three hours after he shot and killed Jaime Ruvalcaba, that car was located, that car was processed and guess where it was processed from, the same area that he was seen entering after the – on the video from the clinic after he shot and killed Jaime."

The prosecutor further argued that defendant's act of fleeing Chicago showed his consciousness of guilt. In closing, the prosecutor argued:

> "Ladies and gentlemen, the prints don't lie, physical evidence doesn't lie. Doesn't lie. It corroborates all of the witnesses. The video doesn't lie. It corroborates all of the evidence. We know it was the defendant and we have proven that beyond a reasonable doubt. We are asking that you find him guilty of first-degree murder, for the first-degree murder of Jaime Ruvalcaba. We are asking you, all of you, to find that he personally discharged the firearm that caused Jaime's death. And we are asking you because now you know. As I told you before, we were going to come back in front of you. Now you know and now you have heard all of the evidence. You have seen the evidence. And all of the evidence only supports one verdict in this case. Find him guilty."

¶ 35    The jury found defendant guilty of first-degree murder and found that he personally discharged a firearm that proximately caused Ruvalcaba's death. Defendant's posttrial motion, which did not raise an allegation of prosecutorial misconduct, was denied by the trial court.

¶ 36    When imposing sentence, the trial court noted that the presentence investigation report indicated that defendant had a past affiliation with the La Raza street gang, but he had no criminal history which confirmed that. The court found that there was "no case that Mr. Ruiz did anything that was motivated by gang animus," and no motive for his actions. The trial court sentenced defendant to 30 years' imprisonment for the murder, and an additional 25-year sentencing enhancement for personally discharging the firearm that caused Ruvalcaba's death for an aggregate sentence of 55 years' imprisonment. The court gave defendant credit for 1490 days spent in presentencing custody and assessed him $659 in fines, fees and court costs.

¶ 37    On appeal, defendant first contends that he was deprived of his right to a fair trial because the prosecutor engaged in a pattern of pervasive prosecutorial misconduct. Defendant claims that several times during trial the prosecutor elicited evidence suggesting that the shooting was gang-related and that defendant was a gang member, in violation of the trial court's ruling on defendant's motion *in limine* barring such evidence. Defendant also contends that the prosecutor   improperly shifted the burden of proof to him in her rebuttal argument regarding the fingerprint evidence by arguing that defendant did not present evidence that he was inside the Chrysler on any other date besides the day of the shooting. In addition, defendant argues that the prosecutor impermissibly injected her personal opinion that he was guilty during her rebuttal argument.

¶ 38    Defendant acknowledges that he forfeited these claims for appeal because he did not object to the alleged gang evidence or the prosecutor's comments during trial and did not raise the issue of prosecutorial misconduct in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). He argues, however, that his claim is reviewable under the second prong of the plain error doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Defendant claims that the repeated instances

of prosecutorial misconduct created a pattern of unfairness that denied him a fair trial. He asserts that regardless of the strength of the evidence of his guilt, the cumulative effect of the prosecutor's errors constituted reversible error entitling him to have his conviction reversed and his case remanded for a new trial. The State responds that defendant's claims are forfeited and cannot be reviewed as plain error because no error occurred.

¶ 39     The plain error doctrine is a limited and narrow exception to the forfeiture rule that exists to protect defendant's rights and the reputation and integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). To obtain plain error relief, defendant must demonstrate that a clear or obvious error occurred, and either: (1) that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him, or (2) that the error was so serious that it affected the fairness of his trial and challenged the integrity of the judicial process. *People v. Sebby*, 2017 IL 119445, ¶ 48. The burden of persuasion is on defendant, and if he fails to meet his burden, his procedural default will be honored. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 40     The first step of plain error review is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶ 49. Accordingly, we must first determine whether the prosecutor introduced impermissible gang evidence, shifted the burden of proof to defendant in her rebuttal argument, or injected her personal opinion that defendant was guilty.

¶ 41     Defendant contends that the State presented evidence that suggested that the shooting was gang-related and that defendant was a gang member, in violation of the trial court's ruling on the motion *in limine*. Defendant argues that multiple police officers testified that they were gang enforcement officers and that other gang enforcement officers were involved in the investigation.

Specifically, defendant points out: (1) Cahue testified that he was assigned to the "Gang Enforcement Unit;" (2) Hiatt testified that he told his partner, some detectives and "the gang team members" who were present what he observed on the video; (3) Corona testified that he knew defendant from the neighborhood and explained "I'm referring to the Back of the Yards, it's known as the La Raza neighborhood;" (4) Vella testified that his "last assignment was gang investigations" and that August 21 was the first day he was with "the 6565 team, gang investigations;" (5) Jones testified that he "monitored a radio transmission from the gang enforcement unit;" and (6) Leticia told defendant that her son "was not a gang banger." Defendant argues that by introducing the word "gang" or "La Raza" into the trial seven times, the State implied to the jury that the shooting was gang-related and that he was a gang member.

¶ 42    The State responds that there was no evidence presented that the shooting was gang-related or that defendant was a gang member. The State argues that the officers merely mentioned their unit of assignment or a unit of the police department that was assisting in the case, and Leticia testified about what she said to defendant while he was holding a gun to her son's head. The State argues that none of this testimony violated the court's ruling on defendant's motion *in limine*. The State points out that during sentencing, the trial court stated that there was "no case that Mr. Ruiz did anything that was motivated by gang animus," and argues that if the court did not think the shooting was gang-related, it is unlikely the jury did. The State further asserts that it is not surprising that defense counsel did not object to any of the testimony during trial because it did not constitute gang evidence or violate the court's ruling.

¶ 43    Evidence of gang membership and gang-related activity is admissible where it is relevant to an issue in dispute, there is sufficient proof that membership is related to the charged offense,

- 19 -

and its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003). In this case, however, we find that the State did not present any evidence that the shooting was gang-related or that defendant was a gang member.

¶ 44 We find the issue raised here similar to that addressed by this court in *People v. Gales*, 248 Ill. App. 3d 204 (1993). In *Gales*, the trial court ruled that the State could not introduce evidence of the gang affiliation of any witness, and the State indicated it did not intend to offer any such evidence during its case in chief. *Gales*, 248 Ill. App. 3d at 227-29. During trial, "[s]everal police officers introduced themselves as 'gang specialist' assigned to 'gang crimes south' with their assignment being 'gang suppression.' " *Id*. at 227. The defendant noted on appeal that the word "gangs" was used more than 96 times during trial and argued that this use of the word indirectly implied that he was a gang member. *Id*. This court pointed out that there was no testimony that any of the defendants were gang members, no testimony about gang activity in the area, and no evidence presented that the investigation was gang related. *Id*. at 228. We noted that the trial court's pretrial ruling clearly barred testimony regarding gang affiliation, and found that the officers' testimony identifying themselves as "gang crimes specialists" did not violate that ruling or infer that the defendant was a gang member. *Id*. at 228-29.

¶ 45 In this case, the trial court's ruling on defendant's motion *in limine* precluded the State from presenting evidence of "gang activity, neighborhood gang conflict and/or gang involvement by Mr. Ruiz." The record shows that the testimony quoted above were the only references to gangs made during trial. Cahue and Vella merely identified their unit of assignment. Hiatt and Jones merely stated that they shared or heard some information with other officers who were assigned to the gang enforcement unit. Corona stated that the Back of the Yards neighborhood was known as

the La Raza neighborhood, but never used the word "gang" or explained that La Raza was a gang. There was no other mention of La Raza during trial, and no indication that the jury would have known that La Raza was a gang. Leticia testified that she repeatedly yelled "just a lot of things that started coming to mind" at defendant while she pleaded with him not to kill her son. There was no evidence that the shooting was gang-related or that defendant was a gang member. In fact, during sentencing the trial court made such a finding when searching for a motive for defendant's actions. Similar to *Gales*, we find that the State did not present any evidence that would cause the jury to infer that the shooting was gang-related or that defendant was a gang member, and thus, it did not violate the trial court's ruling barring gang evidence. Accordingly, the challenged testimony was not erroneous.

¶ 46    Defendant next alleges prosecutorial misconduct based on two comments the prosecutor made during her rebuttal argument. A prosecutor is given considerable latitude in closing argument and is allowed to comment on the evidence and any fair, reasonable inferences that can be drawn therefrom. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Comments made during closing argument must be reviewed in context and in consideration of the entire closing argument of both the State and defendant, and those invited or provoked by defense counsel's argument will not be held improper. *Id.* Defendant's conviction will not be disturbed unless he demonstrates that the challenged remarks were so prejudicial that he was denied real justice or that the verdict would have been different absent the remarks. *People v. Runge*, 234 Ill. 2d 68, 142 (2009).

¶ 47    Initially, the parties disagree as to the proper standard of review. Defendant argues that there is no dispute that the remarks were made, and no factual or credibility issues, therefore a *de novo* standard applies. See *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) (whether a prosecutor's

statements during closing argument were so egregious that they warrant a new trial is a question of law that is reviewed *de novo*). Defendant acknowledges, however, that the appropriate standard of review is unclear as the supreme court has applied both the *de novo* and abuse of discretion standards for issues of prosecutorial misconduct in closing argument. See *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (applying the abuse of discretion standard). Defendant asserts that regardless of which standard is applied, the result here will be the same. The State acknowledges the conflicting standards, but points out that this court recently determined that the propriety of remarks made during closing argument should be reviewed under the abuse of discretion standard as applied in *Blue*. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 54; but see *People v. Cook*, 2018 IL App (1st) 142134, ¶ 64 (holding that the propriety of remarks made during closing argument is reviewed for abuse of discretion, and whether improper remarks, if any, warrant a new trial is reviewed *de novo*). Here, we find no error and would reach the same result under either standard of review.

¶ 48 Defendant contends that the prosecutor shifted the burden of proof to him in her rebuttal argument. Defendant notes that in closing argument, defense counsel pointed out that the fingerprint expert did not know when or how defendant's fingerprints were placed on the Chrysler. Defendant claims that the prosecutor shifted the burden of proof to him when she argued "11 matches. Coincidence? Mistaken? They could have been left any other time? You didn't hear any testimony of any other date other than August 21st of 2012." Defendant claims that this comment stated that he presented no evidence that he was inside the Chrysler on any date other than the day of the shooting, and faulted him for failing to produce exculpatory evidence showing that his fingerprints were left inside the Chrysler on another date.

¶ 49    When viewed in context and in consideration of the entire closing arguments of the State and defendant, we find that the prosecutor's comment was made in direct response to defense counsel's argument that this was a case of mistaken identity and that it was unknown when defendant's fingerprints were left inside the Chrysler. Defense counsel had also argued that "no one came in here and testified that, oh, yeah, that's my friend and I know that he's familiar with these people or that he was in this car. Nobody came in here and said anything like that." The record thus shows that defense counsel had argued that there was a lack of evidence proving that defendant was inside the Chrysler. In response, in addition to the comment challenged by defendant, the prosecutor further argued "By August 21st of 2012 at 7:00 p.m., three hours after he shot and killed Jaime Ruvalcaba, that car was located, that car was processed and guess where it was processed from, the same area that he was seen entering after the – on the video from the clinic after he shot and killed Jaime." The record thereby reveals that the prosecutor was arguing that the only date in question in this case was August 21, and that this was not a case of mistaken identity where the evidence showed that on the day of the shooting, defendant was observed at the crime scene on the surveillance video, and three hours after the shooting, the Chrysler was located in the same area and processed, at which time defendant's fingerprints were found.

¶ 50    The record further reveals that the State never shifted the burden of proof to defendant, and that the State's burden was clearly conveyed to the jury. During closing argument, defense counsel argued that defendant did not have to prove himself innocent and that it was the State's burden alone to prove him guilty beyond a reasonable doubt. In rebuttal, the prosecutor argued that the State's evidence established that defendant was correctly identified as the shooter and that "we have proven that beyond a reasonable doubt." Moreover, the record shows that following closing

arguments, the trial court properly instructed the jury that "[t]he State has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains on the State throughout the case. The defendant is not required to prove his innocence." Accordingly, the prosecutor's comment was not erroneous.

¶ 51    Defendant also contends that the prosecutor impermissibly injected her personal opinion that defendant was guilty in her rebuttal argument when she commented "We know it was the defendant and we have proven that beyond a reasonable doubt." Defendant argues that this comment many have induced the jury to trust the State's judgment rather than its own view of the evidence.

¶ 52    A prosecutor is prohibited from expressing her personal opinion about the defendant's guilt. *People v. Whitlow*, 89 Ill. 2d 322, 341 (1982). However, for the prosecutor's argument to be deemed improper, she must explicitly state that she is asserting her personal view. *People v. Anderson*, 2011 IL App (1st) 071768, ¶ 61. A reviewing court will not infer that a prosecutor injected her personal opinion into an argument where the record does not unambiguously indicate that she did so. *Id.*

¶ 53    Here, the prosecutor did not explicitly state that she was offering her personal view or opinion that defendant was guilty. Instead, her comment was such that the jury would have had to infer that she was offering her personal opinion. When read in context, the record shows that the prosecutor was responding to defense counsel's argument of mistaken identity, reviewing the testimony from each eyewitness, and arguing how all of the other evidence, including the video and fingerprints, corroborated the testimony and proved that it was defendant who murdered Ruvalcaba. The prosecutor's comment was her summation of the evidence, not an improper

expression of her personal opinion that defendant was guilty. We conclude that the prosecutor's use of the phrase "[w]e know" did not improperly align her with the jury or invoke the integrity of her office to promote her personal opinion of defendant's guilt. See *People v. Walls*, 87 Ill. App. 3d 256, 270 (1980) (prosecutor's use of the phrase "we know" was not done to convey his personal belief of defendant's guilt, but rather, to comment on the credibility of defendant's alibi witness). Accordingly, we find no error with the challenged comment.

¶ 54    The record reveals that none of the testimony or comments challenged by defendant constituted error. Consequently, because there was no error, the plain error doctrine cannot be applied, and we honor defendant's procedural default of the issue. *Hillier*, 237 Ill. 2d at 545.

¶ 55    Finally, defendant contends that his mittimus and fines and fees order must be corrected. Defendant argues that his mittimus does not reflect sentencing credit for the days he served in custody in California. He also argues that the $5 electronic citation fee and the $5 court system fee were erroneously assessed and should be vacated from his fines and fees order. The parties agree that this case must be remanded to the trial court to address the issues of correcting the mittimus and the fines and fees order.

¶ 56    On February 26, 2019, while this appeal was pending, our supreme court adopted new Illinois Supreme Court Rule 472, which sets forth the procedure in criminal cases for correcting sentencing errors in, as relevant here, "the imposition or calculation of fines, fees, assessments, or costs" and "the calculation of presentence custody credit." Ill. S. Ct. R. 472 (a)(1), (3) (eff. Mar. 1, 2019). On May 17, 2019, Rule 472 was amended to provide that "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court shall remand

to the circuit court to allow the party to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019). "No appeal may be taken" on the ground of any of the sentencing errors enumerated in the rule unless that alleged error "has first been raised in the circuit court." Ill. S. Ct. R. 472(c) (eff. May 17, 2019). Therefore, pursuant to Rule 472, we "remand to the circuit court to allow [defendant] to file a motion pursuant to this rule," raising the alleged errors regarding the calculation of his presentence custody credit and the imposition of fees. Ill. S. Ct. R. 472(e) (eff. May 17, 2019).

¶ 57    For these reasons, we remand this case to the circuit court of Cook County to address the issues of correcting the mittimus and the fines and fees order, and affirm defendant's conviction in all other respects.

¶ 58    Affirmed; remanded as to sentencing credit and fines, fees, and costs.